## LOWNDES *v.* HUNTINGTON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF NEW YORK.

No. 117.   Argued December 18, 19, 1893. — Decided April 16, 1894.

The grant to the town of Huntington, made by the Governor General under the Duke of York, on the 30th of November, 1666, and confirmed by Governor General Dongan in 1688, and again confirmed, with a change in description, by Governor General Fletcher, in 1694, operated to convey to the grantee the lands under tide water in Huntington Bay, as defined by a line drawn from Lloyd's Neck to Eaton's Neck; and any title to such lands under water which came to the State of New York, was ceded to the trustees of the town by the State, by the act of its legislature of May 10, 1888, c. 279.

In reaching this conclusion this court follows the settled rules of decision in the courts of New York relating to the form of the action, the title to the submerged lands, and the special defences set up in this case.

ON September 1, 1888, the defendant in error commenced an action in the Supreme Court of the State of New York for the county of Suffolk. Its complaint alleged that "the trustees of the freeholders and commonalty of the town of Huntington and their successors" were a body corporate, created and incorporated by and under three charters granted,

VOL. CLIII—1                                              . 1

the first by Richard Nicolls, Governor General under James, Duke of York, of all his territories in America, and dated November 30, 1666; the second by Thomas Dongan, Governor General of the Province of New York under James the Second, King of England, and dated August 2, 1688; and the third by Benjamin Fletcher, Governor General under William and Mary, and dated October 5, 1694.

It also alleged that the plaintiff was the lawful successor of the said trustees, etc., and as such, and by virtue of said patents and charters, and the laws of the State of New York, was the lawful owner and seized in fee, subject to the right of navigation, of a certain described tract of land of about three hundred acres, lying under water in Huntington Bay, in the town of Huntington, and that, as such owner, it was entitled to the exclusive possession and use thereof for oyster cultivation.

The complaint further charged that the defendant had theretofore exercised, and still exercised, acts of ownership upon said lands, and claimed title thereto and a right to the exclusive possession thereof; that he had planted, or caused to be planted, oysters thereon, and unlawfully withheld the lands from the plaintiff.

There was also an allegation of notice to quit, and a prayer for judgment against the defendant for the immediate and exclusive control of the premises. The defendant, who was a citizen of the State of Connecticut, having been brought in by publication, removed the case to the Circuit Court of the United States for the Eastern District of New York. In that court he filed an answer denying plaintiff's title, and pleading possession since 1866. Thereafter, on the 14th of November, 1889, the case was tried before a jury, and, at the close thereof, the court directed a verdict for the plaintiff. On the verdict a judgment was duly rendered, and to reverse such judgment this writ of error was sued out.

In addition to the grants from the Governors General (the language of the description in the first of which is set forth in the opinion, *infra*) the plaintiff claimed under a grant from the State of New York, made by the act of May 10, 1888,

c. 279, which is also more fully set forth in the opinion of the
court.   The map below shows the locality of the disputed
premises.   The defendant's oyster bed is marked A.

*Mr. James C. Carter* for plaintiff in error.

The main questions in dispute are two : First. Did the town of Huntington acquire title to Huntington Bay under its colonial charter ? Second. If it did not, did the act of cession confer upon it such a title as to enable it to maintain an action of ejectment against the defendant below ? These will be considered in their order.

I. The pretensions of the plaintiffs below that they acquired title to the whole of Huntington Bay by the colonial charters, should be promptly dismissed. Such construction of these instruments is rejected by every rule of interpretation applicable to them.

A grant by the sovereign power of lands under public navigable waters, especially of the character and extent alleged by the plaintiffs in the court below, is, in a high degree, unusual and contrary to ordinary public policy. The presumptions are against it. No conveyance should be held to have such an effect unless it appear by clear and unambiguous language that such was the intention. *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420 ; *Martin* v. *Waddell,* 16 Pet. 367 ; *Rice* v. *Railroad Co.,* 1 Black, 358 ; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659; *Lansing* v. *Smith,* 4 Wend. 9 ; *S. C.* 21 Am. Dec. 89. ; *Chenango Bridge* v. *Binghamton Bridge,* 27 N. Y. 87. Reversed, on other grounds, 3 Wall. 51.

Were there, however, no such rule as the above, a just interpretation of the colonial charters upon which the plaintiff below relied would not include in the grant any part of Huntington Bay.

What is Huntington Bay as claimed by the plaintiffs below ? It is all that body of water lying south of a right line drawn from Eaton's Neck Point to Lloyd's Neck Point. Inasmuch as the claim of title to Huntington Bay rests solely upon the assertion that it is a harbor, and, as it is not pretended that it is specifically bounded by any description in the charters, the bounds must be taken as nature has laid them down, and as commonly understood, if there were any common understanding. But no proof was given of any com-

mon understanding, and the only approach to a boundary laid down by nature is that above stated. It can hardly be said that this is a possible boundary even, but there can be no other. There are no other points or headlands which would serve as the *terminus* of a line.

And such was the specific claim of the plaintiffs below, as proved by themselves on the trial.

Huntington Bay, therefore, as the claim is, is an indentation in the land some seven or eight miles wide at the mouth, in all other places between one and two miles wide and between three and four miles deep, and open to the wind and sea through at least six points of the compass. The notion that such a piece of water passed under these charters, as being a harbor, is wholly inadmissible.

There are no words in the charters describing it. Bays are not mentioned.

The plaintiffs below sought to overcome this insuperable difficulty by introducing some feeble testimony to show that, although this enormous tract of water was called a bay, it was in fact a harbor. This effort was an utter failure. They succeeded only in proving that it afforded a shelter for vessels against storms in certain conditions of the wind and not in others. Huntington Bay is not a harbor in any sense of the word, still less within the meaning of the charters.

It is not a harbor within any of the ordinary definitions. A harbor is a place where "ships can ride in safety" (Webster). This does not mean in immediate and present safety. Any straight shore where vessels can anchor may furnish that sort of security. That is not a place of safety where a vessel is in danger upon a change in the fickle wind. A place, in order to be a harbor, must be a harbor at all times and under all conditions, otherwise it is not a place of safety. And there is no pretence that Huntington Bay is a harbor when the wind is anywhere from N. N. E. to N. W. It is, indeed, a place often of extreme danger. If a vessel drawing such a depth of water, as not to permit her to enter Northport or the other harbors leading out of Huntington Bay, were

caught there by a violent north wind, she would be inevitably driven ashore. She would not be able to beat out.

It is not, and never was, called or known as a harbor.

It is in every sense of the word a bay. We hardly need to look into dictionaries to be told that "bay" is an indefinite word used to describe every sort of indentation in the land which is open at the mouth. According to Webster, it is "an arm of the sea extending into the land, not of any definite form, but smaller than a gulf, and larger than a creek."

Undoubtedly as the mouths of bays become narrower, they more and more approach the character of harbors, and would finally cease to be bays and become harbors. There might be instances near the boundary line, where it might be a question whether the word harbor or bay would more properly describe the place. The present, however, is no such instance. There is nowhere a narrowing of the mouth. That continually widens. The place has all the distinguishing features of a bay, and none of those of a harbor.

The case of the plaintiffs below is, in short, this: That although Huntington Bay is not in fact a harbor, and was never called or known as a harbor, it is enough to make it a harbor within the meaning of these charters, if vessels can anchor there and be protected against some winds, although not against others. And this, too, although the presumption is that it was not the intent of the charters to embrace Huntington Bay.

But this is not all. These charters are primarily and principally grants of land, and not of water, still less of public navigable water. So far as they are intended to be grants of water, it is only where the water is incident to the land, and within it. The words describing the waters designed to be conveyed are, "rivers, rivulets, waters, lakes, ponds, brooks, streams, creeks, harbors." It is impossible not to see that the intent and meaning was to convey strictly *interior* waters.

It is for this reason that the courts of New York have hesitated to allow that harbors of navigable waters passed by the grant, although that word was expressly employed. The rule of *ejusdem generis* strongly tends to confine the meaning of

the word harbors, employed in the instruments to harbors of the same kind as the other waters described, namely, creeks, ponds, etc. Except for the abundant proof of claim of title and acts of ownership through a period of two hundred years, the word harbors would not probably have been allowed as sufficient to pass the title to such navigable waters as the cases of *Brookhaven* v. *Strong,* 60 N. Y. 56, and *Robins* v. *Ackerly,* 91 N. Y. 98, related to.

It will be observed that all the proofs of ancient claim of title and acts of ownership contained in the record in this case are limited to Northport Harbor, which is a harbor in the strictest sense of the term, though only for vessels of light draught.

During the period of two hundred years since the grant of the charters, no pretence of title was ever set up to Huntington Bay until about the year 1881, and long after the occupation of the plaintiff in error began. The first act of the town involving any assumption of title to Huntington Bay was a lease for getting gravel in 1881.

If there were no other reason for rejecting the claim set up by the plaintiffs below, the single fact of indefiniteness would be sufficient. If Huntington Bay is not part of Long Island Sound, it must be possible to say where the former ends and the latter begins. But this is wholly impossible. Bay is a word of indefinite meaning, not designed for any purpose of accurate description, and therefore cannot be made a word of description of the premises conveyed by a grant.

Surely the presumption must be that it was the intent of the charters to furnish an intelligent description of the grant. To make the grant include " bays," which are not mentioned in it, is to substitute, in place of a clear and intelligent description, one which is wholly ineffective. What right have we to say that Huntington Bay extends to a line drawn between the headlands above mentioned ?

An ancient and unbroken claim of title to Huntington Bay, accompanied by proof of acts of ownership during the whole period of the claim, would do much towards establishing the title in the town of Huntington, provided there was a distinct

northern boundary to which the proofs would apply; but such a boundary would be necessary.

There is no pretence of such claim of title or act of ownership. The first act of ownership proved is found in an obscure description in a lease by the town of Huntington of a gravel point between the harbor of Northport and Huntington Bay, which seems, although this is not certain, to embrace land under water in Huntington Bay. It is enough to say that this lease was executed in 1881, two hundred years after the charter. All prior acts of ownership proved by the plaintiffs below relate to Northport Harbor, and in no manner to Huntington Bay.

As to distinct claim of title, the first instance appears to be found in the communication of the Trustees of Huntington to the Commissioner of Fisheries. This was in 1886. Leases for oystering were first made in 1882.

When it is borne in mind that in respect to Northport Harbor there had been an effective assertion of title and acts of ownership for a period of one hundred years, (one at least as early as 1795,) the absence of similar assertions and acts in respect of Huntington Bay is of unmistakable significance.

It cannot be said that this was, or might have been, for the reason that there were no adverse claims, and consequently no necessity for affirmative and express assertion. The plaintiff in error had openly staked out his ground and occupied it continuously from 1867. He was never disturbed by suit, or even notice to quit, until 1888. And it was not until November, 1887, that the town came to the conclusion to try its fortunes by a suit at law. And this, too, while it had seven years before met an attempt to dispute its title to Northport Harbor by undertaking the defence of suits brought against its lessees. And even then it was not thought prudent to bring the action until the act of cession already mentioned had been obtained from the legislature.

II. The act of cession of 1888 by the State of New York is wholly ineffective as a support to the present suit.

This is an action of ejectment, and can be maintained only when the plaintiff is entitled to the possession of the property. This act confers no general title. It does not authorize a sale

of the property by the town, or a use of it for any other purpose save that of cultivating oysters. No right conferred upon the town by this deed could be interfered with by any occupation unless it conflicted with the right of the town to cultivate oysters. There is neither allegation nor proof that the occupation of the plaintiff in error at all obstructed the right thus conferred upon the town to cultivate oysters in Huntington Bay. There is no pretence that there was not abundance of other land in the bay equally adapted to the purpose, and sufficient to satisfy every call made upon the town for that purpose.

What the plaintiffs below must really maintain is that they gained by this act of cession the exclusive right to plant oysters in Huntington Bay. Such is not the language of the act, and surely it will not be aided by construction.

III. But it is hardly worth while to argue what the terms of the grant would have conferred upon the town had there been no qualification or exception, for there is an express proviso that the grant is to be " without prejudice to the legal rights, if any, of such persons as now have oysters planted on the lands aforesaid." This clause was expressly designed, and was entirely effectual to protect all such as were in the condition of the plaintiff in error.

It is believed that the design was to protect him alone, there being no other persons engaged in planting oysters there, except perhaps some who had engaged in the work under the recent pretended leases of the town, and who, of course, needed no protection against the town.

It may be argued that this clause is designed to protect those only who had legal rights against the State. This interpretation would be wholly unwarranted.

It does not say that, and an exclusive privilege in the town will not be created by implication.

But such an interpretation would be against settled and familiar rule. It would give the clause no effect. Any rights which any occupant might have had against the State could not have been affected by the conveyance of the State. They would have been fully saved and protected without any such clause.

Still further, and quite conclusively, there was no such class of persons. There was no way in which any right could have been acquired against the State by prescription or adverse user, and no prior grants or leases from the State are pretended. Had there been any such prior grants or leases, they would surely have been specially mentioned as such.

The class of persons whose rights are designed to be protected are described as being "such persons as now have oysters planted on the lands aforesaid." There were such persons, or at least one, the plaintiff in error, who had been carrying on the business on a very large scale for years without protestation by, and with the acquiescence of, the State, and who were still carrying it on at the time of the passage of the act. There can be no question that these were the persons intended to be protected by the State. The legislature had no intention whatever by any act of its own to destroy a privilege which it had cost the parties enjoying it much time, labor, and expense to gain, and which it had permitted to be enjoyed for upwards of twenty years.

What then were the legal rights of the plaintiff? These are fixed with great precision by the necessities and the universal customs of the business and confirmed by the adjudications of the courts. A man who wishes to cultivate oysters by planting them where they will grow to maturity and become fit for consumption, selects a place which is not a natural bed where oysters are produced. He frees it from the starfish, the great enemy of oysters, and from marine growths and trash by cleaning the bottom, and then plants his oysters. No one else has the right to take those oysters. They are his property. Nor has another person a right to plant his own oysters there, for this would destroy the prior right. It is an occupation in the highest degree useful to the public, inasmuch as it is the only way by which a constant supply of the best quality of a most useful food can be furnished.

As against all persons, except the State of New York, therefore, the plaintiff in error had a perfect legal right to the exclusive occupation and enjoyment of his bed.

This has been fully determined by the Supreme Court of the

State of New York, and by decisions which have never been questioned. *Fleet* v. *Hegeman,* 14 Wend. 42; *Decker* v. *Fisher,* 4 Barb. 592; *Lowndes* v. *Dickerson,* 34 Barb. 586; *People* v. *Haven,* 121 N. Y. 313, 316.

These legal rights the plaintiff in error enjoyed before the act of cession against all persons, including the town of Huntington. They were what the proviso in the act of cession was intended to preserve, unaffected by that act. Of course the act cannot be made the ground of affecting them.

The design of the act was not to transfer to the town of Huntington any right which the State might have had to oust the present occupants. The distinct object and purpose of the proviso was to prevent the act of cession from having that effect.

It is to no purpose for the town of Huntington to say that the plaintiff in error had no right to occupy the ground because he was not a resident of the State. That was no concern of the town of Huntington any more than it was of other parties. If the State did not choose to oust him, but had permitted him to remain there for years, it would be an indecency, which the law would not for a moment tolerate, for other parties to trespass upon him.

Nor is it necessary to go into the question whether, being a non-resident, his rights were less than those of residents of the State. He was a resident when he acquired his right, and remained so for many years; his loss of the right, if he did lose it, which is not admitted, by ceasing to be a resident, is a matter which concerns the State alone. Strangers would have no more right to take advantage of such a defect than one man would have a right to oust another from the possession of ordinary real property, on the ground, not that he had a title himself, but that the occupant had none. The town of Huntington stood towards the plaintiff in error prior to the act of cession just as other persons stood towards him, and this condition it was the purpose of the subject clause to preserve.

IV. It may be argued, in support of the judgment below, that while the view above set forth as to the purpose and

meaning of the subject clause in the act of cession may be sound so far as respects any *residents* of the State who might have been occupying lands in Huntington Bay for the cultivation of oysters, yet that the law of New York (Penal Code, § 441,[1]) makes it a misdemeanor for non-residents either to plant or gather oysters in the waters of that State without the consent of the owner, and that consequently the plaintiff in error being at the time of the act of cession a non-resident, had *no* "legal rights" within the meaning of the subject clause. This position is wholly erroneous.

The object and purposes of this penal legislation should be clearly understood. Prior to its passage, and from colonial times, the principal oyster grounds of New York were in the waters within and around Long Island and Staten Island. The Great South Bay extending along nearly the whole southern shore of Long Island, and many of the harbors and interior waters on the north side of the same island, were peculiarly adapted both to the production and cultivation of shellfish. These grounds were owned, some of them by the ancient chartered towns, some of them by private persons under ancient royal and public grants, and some were the property of the State. *Trustees, &c.,* v. *Smith,* 118 N. Y. 634. Those belonging to the towns were sometimes leased, but were commonly left open for operation and use to the inhabitants of the towns, and under this general license non-residents often engaged in the business of oystering. The waters belonging to the State were until a comparatively recent date left to be exploited by all persons indifferently; but in 1866 an act was passed, applicable only to the waters around and adjacent to Staten Island, designed to exclude non-residents from the benefits of such waters. Laws of 1866, c. 404, § 6. Acts prior to

---

[1] SEC. 441. A person who, not being at the time an actual inhabitant and resident of this State, plants oysters in the waters of this State, without the consent of the owner of the same, or of the shore, or gathers oysters or other shellfish from their beds of natural growth, in any such waters on his own account or for his own benefit, or the benefit of a non-resident employer, is guilty of a misdemeanor punishable by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars, or both.

this time had been passed for the purpose of confining the privilege of taking natural oysters from interior waters to the inhabitants of the counties or towns within which such waters were situated, but these were not aimed in particular against non-residents of the State. The use of the abundant public waters of the State, even by non-residents, there being more than enough for all, for the purpose of increasing the supply of wholesome food, was encouraged, at least, by non-interference and tacit assent, until the jealousy of resident oystermen seeking to diminish competition succeeded in introducing a policy of restriction, which was partly begun in respect to waters far distant from the place in controversy by the act, above mentioned, of 1866.

An act was passed in 1878 and amended in 1879, which did aim to exclude non-residents of the State from certain oyster privileges; but it applied only to the taking of oysters from their natural beds, not to the cultivation. Down to 1866 the business of planting oysters for cultivation was protected by the universal custom, by the adjudications of the courts, and by the provisions of positive laws, and no distinction was made between residents and non-residents of the State.

The framers of section 441 of the Criminal Code seem to have constructed that section from the 6th section of chapter 404 of the Laws of 1866, which was aimed at both the planting of oysters and the taking of them from their natural beds in the waters of Richmond County by non-residents of the State, and from sec. 1 of chap. 87 of the Laws of 1879, which was aimed at the gathering of oysters from their natural beds by non-residents of the State. So far as planting is concerned, the prohibition, previously confined to Richmond County, was extended over all the waters of the State.

This provision of the Penal Code was applicable to any of the waters of the State held in private ownership. It is extremely questionable whether it was designed, or should be held, to extend to waters owned by the State. It was probably designed, on the analogy of statutes making wilful trespasses criminal, to afford a remedy more efficient than a suit for damages. The words, " the owner of the same or of the

shore," seem to point to private ownership alone; and there
was no policy, up to the time when the statutes from which
this section was drawn were enacted, to exclude non-residents
from the business of occupying public waters useful for no
other purpose than cultivating oysters. The jealous exclusion
of non-residents from useful business within the State has never
been the policy of the great State of New York, still less where
the business was one calculated to increase the supply of whole-
some food.

We are now to turn to the situation of the plaintiff in error,
as affected by § 441 of the Penal Code. He started out and
prepared his bed and began his planting as early as 1867.
Even had he been a non-resident of the State, he would have
acquired at that time a full and perfect right to hold and main-
tain that bed as against every one but the State; and even
against the State until the license evidenced by the long con-
tinued practice and toleration had been revoked by some
distinct act. The State could not have treated him as a tres-
passer. Moreover, its own express legislation above cited, of
1866, would have protected him.

But he was a resident of the State until 1872, and, of course,
no question could be made as to the perfect acquisition of his
right.

Can it be thought that it was the design of § 441 of the
Penal Code to revoke the license and permission under which
the plaintiff in error had acted, upon the strength of which he
had expended much labor and money, and to destroy the use-
ful business which he had been carrying on? Surely, no such
interpretation can be sanctioned unless the language of the act
compels it.

But there is no necessity for such a harsh interpretation.
On the contrary, the language of the section does not permit
it. The plaintiff in error has never planted oysters in Hunt-
ington Bay "without the consent of the owners of the same."
It is not requisite that this consent should be in writing. Any
evidence tending to show consent or acquiescence is sufficient.
And, surely, the facts that from the first, and down to the time
of the passage of this penal enactment, it had been the custom

for all, without distinction of residence, to use the public waters of the State for this useful purpose, and that they had been protected in that use not only by the common law and the adjudications of the courts, but by the express legislation of the State, are abundant proof of consent.

If any private individual or town authorities owning such land under water had so stood by, and seen a non-resident thus occupying their land, had encouraged him in such occupation, and protected him against strangers, could the occupant have been indicted and punished under this statute as having planted oysters " in the waters of this State without the consent of the owner of the same? " There is no reason for applying a different rule to the State. The State cannot be presumed to intend what " would be disreputable in an individual." Marshall, C. J., in *Grant* v. *Raymond*, 6 Pet. 218, 244.

We do not of course mean that the State could not withdraw its consent and put an end to its possession. But this would be done by some distinct affirmative act, such as a law declaring that non-residents who were in the occupation of its lands for such purposes should no longer be permitted to so occupy them. And, of course, such an act should make suitable provision, which, while preventing further planting, would allow the occupant the privilege of keeping his oysters on the ground until they had grown large enough for the market, and then of removing them.

Plainly it was no part of the purpose of this enactment to accomplish any revocation of prior consent.

Fortunately the act is capable of a reasonable construction ; and that is to apply it to the future and not to the past ; to make the future establishment of beds unlawful, leaving those already established unaffected. Should it at any time be thought to be a wise policy to break up the existing business of non-residents, legislation may easily be shaped for that purpose ; but we should expect it to include provisions, giving a reasonable time to the occupant to take up his oysters after they had grown to a size suitable for the market. Such provision is found in the eighth section of the act of 1887.

This construction may indeed be said to be the necessary

one, for the act did not, in terms, give to residents any right
to plant oysters, and yet it must be understood as recognizing
an existing right in residents to plant.   Such existing right
could only be founded on the prior tacit consent of the State
as evidenced by the custom, the adjudications, and the posi-
tive laws protecting it.   But such custom, adjudications, and
positive laws protected all actual occupants, whether residents
or non-residents.   In short, the statute should be treated as
assuming, what was clearly the fact, that all those then en-
gaged in the business had the consent of the owners of the
waters, except it might be in cases where there was a private
ownership, and the planting had been done by non-residents
against the will of the owner.

The statute, it will be observed, requires much in the way
of construction in order to render it constitutional.   In the
first place, the words " on his own account or for his own
benefit, or the benefit of a non-resident employer," which are
annexed to the offence of gathering, must also be understood
as applying equally to the offence of planting.   *People* v.
*Lowndes*, 130 N. Y. 455.   And the words, " without the con-
sent of the owner of the same, or of the shore," annexed to
the offence of planting, must be understood as applicable also
to the offence of gathering; otherwise, the private owner of a
natural bed of oysters would be forbidden to sell to non-resi-
dents oysters to be taken from the bed, or even to employ a
non-resident workman to gather oysters for him — an interfer-
ence with the inalienable rights of property and a discrimina-
tion against non-residents quite beyond the legislative power
of the State.

And if there were any remaining doubt concerning the pro-
priety of the suggested interpretation, it would be removed by
a reference to the subsequent legislative provisions contained
in the act of 1879, above referred to.

The first section of that act unmistakably intends to pre-
serve and protect all existing occupations for the purpose
of planting oysters, and the fifth section makes the rental
exacted much less than in the case of future occupations.   It
cannot be that in this respect an unexpressed distinction was

intended between residents and non-residents, for the fact was notorious that the existing occupations were by non-residents as well as by residents; and had any such distinction been designed, it would certainly have been expressed, because where that distinction was intended it was expressed, as in the fourth section.

The provisions of the first and fourth sections can be made to stand together by limiting the operation of the fourth section to the cases not before provided for.

To hold that grants of leases to present occupants could be made only when such occupants were residents would require us to read into the first section, at the end thereof, the words, "and shall have resided in this State at least one year preceding the date of application." And even this would not make a consistent interpretation, for many occupations might cover, as that of the plaintiff in error did, more than two hundred and fifty acres, and the excess could not be leased to any one.

The manifest policy of this act was this: The land of the State under water suitable for the purpose of oyster planting was to be surveyed and leased for that purpose, and a revenue to be derived from it. All existing occupations were to be left unaffected, if the occupants wished to continue them and pay a rental of twenty-five cents per acre, and in such cases perpetual leases were to be given for the whole extent occupied. But, in respect to leases to new occupants, the privilege was to be confined to residents, the number of acres to be limited to two hundred and fifty, and the rental to be one dollar per acre.

This interpretation is consistent with justice and equity. It would have been an outrage for the State in seeking, not to reserve natural oyster beds for its own citizens, but the mere bottom of its public waters, where there were no natural oysters, to treat as trespassers such non-residents as had, under its own tacit permission and encouragement, and at great expense, prepared certain places for oyster cultivation and deposited there large quantities of young oysters, and compel them to lose their investment. No such design will be imputed to a great and sovereign State.

It should be observed, that the unnecessary and unwise dis-crimination in this act between residents and non-residents in respect to the use of the bottom of public waters for the cultivation of oysters was abrogated by c. 321 of the Laws of 1893.

*Mr. David B. Hill* for defendants in error. (*Mr. N. S. Ackerly, Mr. C. R. Street,* and *Mr. Thomas Young* were with him on his brief.)

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The questions in this case are mainly of a local character, in respect to which the settled rule of decision in the courts of the State is controlling. They relate to the form of the action, the title of the plaintiff to submerged lands in Huntington Bay, and the special defences of the defendant.

By Rev. Stat. § 914, the practice, forms, and mode of proceedings in actions at law in the Federal courts are required to conform as nearly as may be to those in the state courts.

The present action is one in the nature of an action of ejectment, and to secure to the plaintiff the undisturbed control of the tract in controversy. In the State of New York there is but one form of action, the plaintiff being required by the statutes of that State to set forth in his petition the facts upon which he bases his cause of action, and the relief is given according to the facts as stated and proved.

In a certain sense these submerged lands are not in the actual possession of any one, but § 1502 of the Code of Civil Procedure of New York provides for just such an exigency. It reads: "Where the complaint demands judgment for the immediate possession of the property, if the property is actually occupied, the occupant thereof must be made defendant in the action. If it is not so occupied, the action must be brought against some person exercising acts of ownership thereupon, or claiming title thereto, or an interest therein at the time of the commencement of the action."

The defendant claiming the right to occupy this submerged land for the cultivation of oysters, must be deemed to have been in the actual possession thereof, or, if not, as exercising acts of ownership thereupon and claiming an interest therein. Under those circumstances he was properly made a defendant in an action to secure to the plaintiff the immediate possession of the premises; such an action is recognized as appropriate in New York. *Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1, and cases cited in the opinion.

With respect to the matter of title, there are involved not merely the construction of public grants and charters, but also the extent and purposes to and for which the title and control of submerged lands may be passed away from the State to towns and individuals. The question is of the rights attaching to certain lands within the territorial limits of the State, and whatever becomes a settled rule of real property by the decisions of its courts is conclusive on this court. *Bondurant* v. *Watson*, 103 U. S. 281, 289; *Burgess* v. *Seligman*, 107 U. S. 20, 33; *Gage* v. *Pumpelly*, 115 U. S. 454; *Hardin* v. *Jordan*, 140 U. S. 371, 382, 402; *Shively* v. *Bowlby*, 152 U. S. 1.

The title of the plaintiff rests primarily on the three charters referred to in the complaint, and which were admitted in evidence. Those charters are grants of both territory and corporate franchises. The description in the first, that from Governor Nicolls, is as follows:

"All ye Lands that already have been or hereafter shall bee Purchased for and on the behalfe of the said Towne of Huntington whether from the Natives Proprietors or others within the Limitts and Bounds herein exprest (vizt) that is to say from a Certaine River or Creeke on the west comonly called by the Indyans by the Name of Nackaquatack and by the English the Coldspring to Stretch Eastward to Nasaquack River on the North to bee Bounded by the Sound runing betwixt Long Island and the Maine and on ye South by the Sea Including there Nine Severall Necks of Meadow Ground all wch Tract of Land together with the sd Necks thereunto Belonging wthin the Bounds and Limitts aforesaid and all or any Plantacon there upon are to belong to the said Towne of

Huntington as also all Havens Harbours Creekes Quarryes Woodland Meadowes Pastures Marshes Waters Lakes ffishing Hawking Hunting and ffowling And all other Proffitts, Commodityes, Emolumts, and Hereditamts to the said Land and prmisses within the Limitts and Bounds aforementioned described belonging or in any wise appertaining To have & to hold the said Lands and Necks of Lands Hereditamts and prmisses with their and every of their Appurtenances and of every Part & Parcell thereof to the said Patentees and their Associates to the proper use and behoofe of the said Patentees and their Associates their Heires Successors and Assignes forever; And I do likewise hereby Confirme and Graunt unto the said Patentees and their Associates their Heires Successors and Assignes all the Priviledges belonging to a Towne within this Governmt and that the Place of their prsent Habitacon shall continue and retaine the Name of Huntington by wch name it shall bee distinguisht and knowne in all Bargaines and Sales Deedes Records and Writings."

The second charter, that from Governor Dongan, is a confirmation of the first, and the description is substantially the same. The third, from Governor Fletcher, refers to the prior charter from Governor Nicolls, and recites a petition of the freeholders, inhabitants of the town of Huntington, for a " Grant and Confirmation of the Premises so only as that the Limits & Bounds of the sayd Towne of Huntingtone shall not be as above mentioned but as hereafter Expressed," and then grants by a description as follows :

" Bound on the West by a River Called & known by the Name of Cold Spring a Lyne Runing South from the Head of the sayd Cold Spring to the South Sea & on the North by the Sound that Runns between our sayd Isld of Nassaw and the maine Continent & on the East by a Lyne Runing from the West syde of a Pond called & known be the Name of fresh Pond to the West syde of Whitmans Dale or Hollow and from thence to a River on the South syde of our sayd Island of Nassaw on the East syde of a Neck called Sumpaw-wawins and from the sayd River Runing South to the sayd South Sea Togither with all and Singular the Houses Mes-

suages Tenements Buildings Mills Mill damms fenceing In-
closures Gardens Orchards fields Pastures Feedings Woods
Underwoods Trees Timber Comon of Pasture Meadows
Marshes Swamps Plaines Rivers Rivoletts Waters Lakes
Ponds Brooks Streams Beaches Quarries Creeks Harbors
Highways & Easements fishing fowleing hunting and hawking
Mines Mineralls (Silver and Gold Mines Excepted) & all other
franchises Profits benefits Comoditys & Hereditaments what-
soever to the sayd Tract of Land within the Limits and
Bounds next above mentioned belonging or in any ways
appertaining or there with all used Accepted Reputed or
taken to belong or in any ways Appertaine to all intents and
Purposes and Constructions w'tsoever and also all & Singular
the Rents Arrearages of Rents Issues and Profits of the sayd
Tract of Land & Premisses heretofore due and Payable."

It will be seen from these quotations that the boundary on
the north, as given in the Nicolls charter, is the "sound run-
ing betwixt Long Island and the Maine," and in the Fletcher,
"the Sound that Runns between our sayd Isle of Nassaw and
the maine Continent." And the question is whether the tract
in controversy is south of this north boundary line. The map
will help to a clear understanding of the question (*ante*, 3).

The tract in controversy, marked "A" on this map, is
within the limits of what is named thereon "Huntington
Bay." The contention of the defendant is that that body of
water is a part of the Sound, and that, therefore, the north
boundary granted to the town of Huntington runs to the
south of the tract in controversy. Referring to the words
used to describe the appurtenances to this grant, it is urged
that, although the general term "waters" is found therein, its
place alongside of the words "rivers, rivoletts, lakes, ponds,
brooks, streams," indicates that it refers exclusively to interior
waters, and not to anything in the nature of a harbor, bay, or
haven; and that when we turn to the terms which may prop-
erly be construed as referring to exterior waters, only the two,
"creeks" and "harbors," are found; that this Huntington Bay
is not, strictly speaking, a harbor, in that it is not land-locked
and a place of absolute safety for shipping, being entirely open

and exposed on the northerly side; that this, being a public grant, is to be construed strictly against the grantee; that, inasmuch as bays are not mentioned, bays are not granted; and that the description of the Sound as the north boundary excludes that body of water, with all its inlets and bays, from the scope of the grant.

We are unable to concur in these views. If the language in the description of boundaries is clear, that should control, and should not be narrowed and limited by any mere ambiguity in the subsequent statement of the appurtenances to the grant. Or, to state the proposition in another form, whenever we are considering the matter of boundary we naturally turn to the words by which the boundary is described, and accept those words as controlling, and do not look to those by which the scrivener attempts to define that which is to pass with the granted premises as appurtenant thereto, to see what is omitted therefrom, or what is uncertain therein. For when in the preparation of any instrument the attention is directed to a particular subject, it is to be expected that language expressing the exact thought of the writer in respect thereto will be selected, and the ordinary force and scope of that language should not be destroyed by words and phrases used in another portion of the instrument in the description of some other matter. As said by the Supreme Court of Kansas, in *Long* v. *Culp*, 14 Kansas, 412, 414: "It is also a rule of construction that when one section of a statute treats specially and solely of a matter, that section prevails in reference to that matter over other sections in which only incidental reference is made thereto. Not because one section has more force as a legislative enactment than another, but because the legislative mind having been, in the one section, directed to this matter, must be presumed to have there expressed its intention thereon rather than in other sections where its attention was turned to other things. *Griffith* v. *Carter* 8 Kansas, 565."

The northern boundaries in all these charters is given as "the Sound." That was then, and is now, a well-known body of water. It opens into the Atlantic Ocean, but is separate and distinct therefrom. Into it flow many rivers, and open

many bays, harbors, and inlets; but the fact of a connection between them and it does not make them a part of the Sound. If the words describing the appurtenances were omitted from this grant, should not its boundaries be understood to be the same as now? So the question is not whether this body of water in which the tract in controversy is situated is strictly a harbor or a bay, but whether it is neither, and only a part of the Sound. If it was then known as an independent body of water, by whatsoever name called, that is enough to eliminate it in tracing the boundary of the grant. That it was so known is not open to question; it was not, therefore, a part of the Sound, and the boundary of the grant ran on the north of it.

While not perhaps of much significance, it may be noticed that in the first charter, that from Governor Nicolls, the description of the appurtenances is " havens, harbors, creekes," etc. The word " haven " has perhaps a broader signification than " harbor." At any rate, the use of both words in the same grant suggests that all bodies of water which might come within the reach of either term were intended to be included in the grant. In Webster the first definition given to the word " haven " is " a bay, recess, or inlet of the sea, or the mouth of a river, which affords good anchorage and a safe station for ships." While this bay might not be a place of safety against all storms coming from any direction, it was protected on three sides, and to that extent was " a safe station for ships."

In the case of *Rogers* v. *Jones*, 1 Wend. 237, the controversy was in respect to the property in the town immediately west of the town of Huntington, to wit, Oyster Bay. An examination of a map of Long Island and the Sound shows that the bay of Oyster Bay is no more of a harbor than Huntington Bay. It is just as open on the northerly side. The town of Oyster Bay had a charter similar to that of the town of Huntington, the northern boundary being " the Sound," and the grant being " with all the woodland, plains, meadows, pastures, quarries, marshes, waters, lakes, rivers, fishing, hawking, hunting, and fowling, and all other profits and emoluments to the tract belonging." The action was one

to recover a penalty for taking oysters contrary to a by-law of the town. The facts, as stated in the record, were as follows:

"On April 8, 1825, Rogers, the defendant below, being a citizen of the State of New York, did fish and oyster in the waters of the bay or harbor of Oyster-Bay, and took and carried away 100 oysters. The place where the oysters were taken was adjacent to and within one mile of Long Island Sound, opposite the village or town of Oyster-Bay, nearer Lloyd's Neck than any other land, within about one hundred yards of the beach on the said neck, and where the water in the bay is at least twenty feet deep at low water. On April 11, 1825, the suit was commenced before the justice by Jones, who was, at the time, the supervisor of the town."

Comparing the maps of the two bays, it is obvious that the *locus in quo* in that case was as properly to be considered within the limits of Long Island Sound as that in the present case. It is true no discussion of the point here made is found in the opinion there filed, and, therefore, it is not a direct adjudication. It seems to have been assumed that the tract being within the limits of the bay was south of the Sound, and, therefore, within the boundaries of the grant, and the question considered and determined was whether the grant carried the land under water, together with the exclusive right of fishing in such water, and it was held that it did.

A case also in point is *Brookhaven* v. *Strong*, 60 N. Y. 56, 57. That action was, as stated, one "brought to recover damages for taking oysters from the Great South Bay which extends along the south side of Long Island, separated from the ocean by the Great South beach, and to establish the exclusive right of the town of Brookhaven to the oyster fisheries in that portion of said bay lying between Huntington, East Gut, and Long Point."

"The bay is a sheet of water some fifty miles long and in the widest part five miles wide. The tide ebbs and flows throughout its whole extent, and it is navigable for vessels drawing from seven to eight feet of water. Plaintiffs claimed to be the owner of the bay within the limits above mentioned,

and of an exclusive right of fishery therein.   Defendant admitted the taking of the oysters, but denied the exclusive right claimed by plaintiffs, and alleged that the place where they were taken was within the bounds of the town of Islip and was part of the navigable waters of the State, and that he being a resident of the town of Islip had a right to take the oysters."

The south boundary of the grant made in 1666 to the town of Brookhaven was " the sea or main ocean," and it was held that the grant included this bay, the court saying : " Nor can the objection that the bay was not included in the grant be sustained.   The general boundary is the ocean, which includes the beach, and of course the bay."

There is nothing in the case of *Robins* v. *Ackerly,* 91 N. Y. 98, 104, which makes against the conclusion we have expressed. In that case the question was as to oyster beds in Northport harbor, a body of water adjacent to Huntington Bay.   That harbor, as appears from the map, is land-locked, and this fact was referred to in the opinion as among the matters indicating that it was within the grant to the town of Huntington. While the court refers to that as an additional reason for the conclusion reached, it does not make that the turning point. We quote its language :

" The northern boundary of the town is the Sound.   This includes, we think, Northport harbor where the oyster beds in question are located.   The language of the grant includes ' all havens, harbors, creeks,' as well as ' fishing, hawking, hunting and fowling.'   In the *Brookhaven case* the south boundary was the ocean, and there was a sandy flat or beach between the ocean and the bay, and the question was raised that the South Bay was not within the grant.   This court held that this objection could not be sustained, and that the southern boundary, which was the ocean, included the beach and of course the bay, etc.   The patent under which the plaintiff claims is bounded on the north by the Sound.   Adjacent to the Sound is Eaton's Neck and Eaton's Neck Beach, and south of this is Northport harbor.   By analogy, both Eaton's Neck and Eaton's Neck Beach are within the patents and necessarily

the harbor also. The boundary by the sound includes all the land south of the Sound. That this was intended is indicated by the use of the words in the grant, ' harbor, havens,' etc. That Northport harbor was included within the limits of the boundaries was proved by the undisputed evidence of the surveyor and others. It was also proved that Eaton's Neck Beach was leased by the town. It should also be noticed that Northport harbor is land-locked, and has always been used and distinguished as a harbor."

Each of these three cases from the highest court of the State of New York treats that which is named as the boundary on the north or south, the Sound or the ocean, as referring directly to the body of water known by such name, and not as including waters opening into or connected with it.

Further, there is independent testimony tending to show that this Huntington Bay was called indiscriminately " bay " or " harbor" at the time of the original grant. Thus, in the grant made by Governor Nicolls, on June 22, 1667, of Eaton's Neck to George Baldwin, the description is " a Certain Parcell or Neck of Land Commonly called Eaton's Neck lying and being in the East Riding of Yorkshire upon Long Island on the North side of the said Island to the East of Huntington Bay where striking out into the Sound it is thereby bounded to the North East and South and on ye West with Huntington Harbour ; " and in a conveyance of the same land made by Baldwin, on July 11, 1668, the description is " neck of Land commonly Called and known by the name of Easton Neck lying on the East side of Huntington Harbour bounded as is Specified in the patent granted for that Neck of Land." There is also other testimony to the effect that this body of water has been known as " Huntington Bay " as far back as any memory extends, or any records are found ; and whether bay or harbor, it was a distinct body of water, always so known and called.

No question exists as to the validity of these ancient grants, or that they were broad enough to include oyster rights in the waters within them. The subsequent legislation of the colony and the State affirms their validity. Thus, on May 6, 1691,

the colonial legislature passed an act, entitled "An Act for Settling, Quieting and Confirming unto the Cities, Towns, Manors, and Freeholders within this Province their several Grants Patents and Rights respectively." The first section enacted:

" That all the Charters, Patents and Grants, made, given, and granted, and well and truly executed under the Seal of this Province, constituted and authorized by their late and present Majesties, the Kings of England, and registered in the Secretary's office, unto the several and respective Corporations or Bodies Politick of the Cities, Towns, and Manors, and also to the several and respective freeholders within this Province, are and shall forever be deemed, esteemed, and reputed good and effectual Charters, Patents, and Grants authentick in the Law, against their Majesties, Their Heirs, and Successors, forever."

And in the second section it was provided:

" And be it further Enacted by the Authority aforesaid, That all the Charters, Patents, and Grants made, given, and granted, as aforesaid unto all and every the several and respective Corporations or Bodies Politick of the Cities, Towns, and Manors, and their successors, and also unto all and every the respective Freeholders, their Heirs and Assigns, forever, within this Province, are, to all Intents and Purposes whatsoever, hereby ratified and confirmed."

Section 36 of the first constitution of the State of New York contained this provision:

" And be it further ordained: That all grants of land within this State, made by the King of Great Britain, or persons acting under his authority, after the fourteenth day of October, 1775, shall be null and void; but that nothing in the Constitution contained shall be construed to affect any grants of land, within this State, made by the authority of the said King, or his predecessors, or to annul any charters to bodies politic by him, or them, or any of them, made prior to that date."

A similar one is found in section 18 of article 1 of the constitution of 1846. See upon this question of validity, in addition to the authorities heretofore quoted, *People* v. *Van Rensselaer*, 9 N. Y. 291, 346.

Again, it is worthy of note that that fact is apparent from
the testimony in this case, which was noticed by the Court of
Appeals as significant in the case of *Brookhaven* v. *Strong*, 60
N. Y. 56, 71, to wit, a long-continued exercise and control
over these submerged lands on the part of the town. Several
entries taken from the records of the proceedings of the town
were offered in evidence. One, dated June 1, 1795, is as fol-
lows: "Whereas sundry persons are making a practice of tak-
ing and carrying away clams and oysters from the harbors
on the north side of the town of Huntington, for the preven-
tion of which be it enacted and ordained by the trustees of
the freeholders and commonalty of the town of Huntington,
and it is hereby enacted and ordained by the authority of the
same, that if any person or persons, after the 10th day of
June, 1795, shall take and carry away out of any of the har-
bors of the north side of the township of Huntington any
clams or oysters he or they, or any of them so offending, shall
forfeit the sum of 40*s.* for every offence contrary to the true
intent and meaning of this act, and shall be prosecuted," etc.;
one substantially similar, of date June 20, 1796. Subse-
quently, in 1803, 1810, 1818, 1823, 1828, 1833, 1838, 1844, and
1849, by-laws were passed, aimed with more or less directness
of expression at restraint upon the "fishing, clamming, oyster-
ing," catching oysters, clams, and fish in the waters of the
town of Huntington. It is not meant by this to imply that
any of these by-laws specifically named Huntington Bay as a
part of the waters belonging to the town of Huntington; all
that is meant to suggest is that there was during those years
a continued assertion of the right on the part of the town to
control the catching of oysters in the waters of the town.
Obviously, the planting of oysters was not then a matter much
thought of, but from 1855 the occupation of the submerged
lands for the purpose of the cultivation of the oyster seems to
have attracted the attention of the town authorities. Thus, on
April 3, 1855, at a town meeting, this resolution was passed:

"*Resolved*, That all persons be prohibited from putting down
stakes in any of the harbors of the town of Huntington to
mark the lines of the oyster beds that will in any way obstruct
fishing with nets, under the penalty of $12.50."

On April 7, 1857, at a town meeting, the trustees were authorized " to make rules and regulations for the planting of oysters, receive applications, and grant permissions to the inhabitants" of the town for planting oysters. On April 4, 1871, the town record contains this recital:

" At a town meeting, resolved that the trustees of this town be authorized, empowered, and directed to lease the lands immediately suitable for oyster beds in the bays and harbors belonging under the waters of the town of Huntington. Before doing so they shall take proper counsel therein as to the best and safest manner of leasing said grounds. None but residents have the privilege to said lease, and those residents having oysters already planted be entitled to the first privilege, and the trustees be required to give public notice for two weeks before adopting the resolution for the terms and manner of leasing."

And in the town records are found, subsequently to these entries, by-laws and resolutions of a similar import.

Still further, on May 10, 1888, c. 279, the legislature of New York passed an act which is as follows:

" SECTION 1. All the right, title, and interest which the people of the State of New York have, if any, in and to the lands outside of and beyond low-water mark under the waters of Huntington Bay, in the town of Huntington, Suffolk County, southerly of a line drawn from a granite monument now set near high-water mark on the northernly point of Eaton's Neck, and west of the United States Life Saving Station to a locust monument now set on Lloyd's Neck, which line runs on a course south fifty-nine degrees, twenty minutes and twenty-five seconds west, and which is the line claimed by the trustees of the town of Huntington as the northerly line of their grants under colonial patents, is hereby ceded to the present trustees of the town of Huntington, Suffolk County, and their successors in office, for the purpose of oyster cultivation. Provided, nothing in this act shall be held to interfere with the rights and powers of the commissioners of the land office to grant all the right, title, and interest of the State to lands under water in said bay, to the owners of

adjacent uplands for purposes of commerce or beneficial enjoyment, and nothing herein contained shall be construed as interfering with the rights of riparian owners. Subject, however, and without prejudice to the legal rights, if any, of such persons as now have oysters planted on the lands aforesaid." (Laws of New York, 111th Session, 1888, p. 494.)

In respect to this cession the Court of Appeals in *People* v. *Lowndes*, 130 N. Y. 455, 461, said : " If the *locus in quo* was not within the colonial patent or grant, it was the property of the State, and passed to the trustees of the town of Huntington by the legislative act of cession of May, preceding the time of the alleged offence." That was a case in which the defendant was prosecuted for a violation of section 441 of the Penal Code of the State of New York, which is as follows : " A person who, not being at the time an actual in-habitant and resident of this State, plants oysters in the waters of this State, without the consent of the owner of the same, or of the shore, or gathers oysters or other shellfish from their beds of natural growth, in any such waters on his own account, or for his own benefit, or the benefit of a non-resident employer, is guilty of a misdemeanor, punishable by imprisonment not exceeding six months, or by a fine not exceeding one hundred dollars, or both ; " and the place at which the offence was charged to have been committed was in Huntington Bay. That case was, however, decided on the question of the sufficiency of the indictment, and perhaps, therefore, the quotation may be considered as simply dictum, but whether dictum or not, we think it is correct. Either the title to these submerged lands passed by virtue of the colonial grants to the town of Huntington, or else it was in the State of New York, *Martin* v. *Waddell*, 16 Pet. 367 ; *Pollard* v. *Hagan*, 3 How. 212 ; *Shively* v. *Bowlby*, 152 U. S. 1, and this act, whose validity seems not to be questioned, cedes all the right, title, and interest of the State in these lands to the town, so far at least as is necessary for the purpose of oyster cultivation.

It is clearly exclusive in its scope. Such is the plain import of its terms. Even if the language were less clear, reliance

might be had on the rule of construction in respect to such grants laid down by the Court of Appeals. *Langdon* v. *New York City*, 93 N. Y. 129, 144. " But when the sovereign grants land under water, which cannot in its natural state be subjected to any of the uses to which dry land may be devoted, then a different rule of construction must be applied to the grant, so as to make it effectual for some purpose. Such a grant may be made to give an exclusive right of fishery, or of navigation, or to enable the grantee to fill up the land for wharves and docks or other buildings. The purpose may be plainly expressed in the grant ; if it be not, then the intent of the parties must be ascertained from the nature and situation of the land granted and all the circumstances surrounding the grant which may properly be considered for the purpose of ascertaining such intent."

Proper notice to quit was served upon the defendant, and hence it follows, that the judgment was rightfully entered against him, unless he has shown some affirmative title or right in himself. He pleads possession and use of the premises for the purposes of oyster cultivation for more than twenty years, but in order to create a title springing out of possession such possession must be adverse and exclusive, and of that the defendant makes no pretence. There was in evidence an application made by him on October 10, 1887, to the commissioner of fisheries of the State of New York for a perpetual franchise for planting and cultivating shellfish on the premises, which application was denied, and in respect to it he testified :

" The lands described in that exhibit are the lands embraced in this suit. These are the lands I occupy now. I did not get any grant on that application. The town put in a demurrer. When I commenced to plant oysters on these grounds, I claimed that the bottoms were owned by the State. I do yet. I don't claim to own the ground at all. In the year 1867 I planted probably — well, I never measured. I staked off a square what I thought would be competent to hold 3000 bushels or 2500, the amount I had money enough to buy and plant on it, indiscriminate of the number of acres. I didn't plant more than 3000 bushels then. I did not plant

more than ten acres in 1867.   I don't think I planted more than ten acres in 1868."

In other words, all that he claims is that he had an implied license from the State, but such license (if one existed) was subject to revocation, and was revoked by the notice served upon him by the plaintiff, to whom the State had ceded all its rights.

These are the material questions in the case, and in the decision of them there was no error.   Therefore the judgment is

*Affirmed.*

Mr. Justice White was not a member of the court when this case was argued, and took no part in its decision.