### THE STELLA B.

(District Court, E. D. New York. September 15, 1910.)

1. NAVIGABLE WATERS (§ 2*)—POWER OF UNITED STATES TO REGULATE NAVIGATION—EFFECT OF COLONIAL CHARTERS.

The rights granted to the town of Huntington, on Long Island, by the charter of 1666, signed by Richard Nicoll, Governor General, by authority of James, Duke of York, later confirmed by other grants by authority of the sovereigns of England, so far as relates to navigable waters within the town, were subject to the general sovereignty and jurisdiction of the government under which the town existed, to which general jurisdiction the state of New York and the United States have legally succeeded, and the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

laws of the United States regulating navigation are applicable to and binding on all craft on that portion of Great South Bay within the town, the same as upon vessels on navigable waters elsewhere.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 2; Dec. Dig. § 2.*]

2. SHIPPING (§ 16*)—VIOLATION OF INLAND NAVIGATION RULES—ACTION FOR PENALTY.

Penalties incurred by a vessel for violation of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 96 [U. S. Comp. St. 1901. p. 2875]) are recoverable by action brought by the United States under section 4 of the act, although the offense may have been committed on waters within a district having jurisdiction to prescribe local rules.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 30–44; Dec. Dig. § 16.*]

In Admiralty. Action by the United States against the power boat Stella B. Decree for libelant.

William J. Youngs, U. S. Atty. (Wm. P. Allen and Wm. A. Moore, Asst. U. S. Attys., of counsel), for libelant.

Raymond C. Haff, in pro. per.

CHATFIELD, District Judge. The power boat Stella B, on July 30, 1908, was being operated upon a portion of the waters of what is generally known as Great South Bay, or one of the navigable arms thereof, and did not comply with the provisions of Act June 7, 1897, c. 4, 30 Stat. 96 (U. S. Comp. St. 1901, p. 2875), requiring the maintenance of a red port light, a green starboard light, and a white masthead light placed and constructed according to the provisions of the statute. On the other hand, the boat did comply with the local and town ordinances and rules (if any there be) of the township of Huntington, within whose limits it was at the time. The United States has filed a libel for the statutory penalty upon the assumption that the boat was subject to the law of Congress referred to, and has alleged that it was upon an arm of the sea capable of being used for interstate commerce, and within the admiralty jurisdiction of the United States.

The contention of the claimant is that the statute relied upon has no application, and that the United States has no jurisdiction, inasmuch as the town of Huntington received by charter from the Governor of the colony of New York, under the crown of England, title to all of the territory, including the locality in question, both land and water, and the various rights to and uses of that land and water, which patent or charter, by authority of James, Duke of York, dated November 30, 1666, and signed and sealed by Richard Nicoll, as Governor General, later confirmed on the 2d of August, 1688, by Gov. Dongan, under the authority of James II, king of England, and again on the 5th of October, 1694, confirmed by Benj. Fletcher, under the authority of William and Mary, king and queen of England, was recognized and confirmed by an act of the colonial Legislature on the 6th of May, 1691. The claimant alleges that the treaty of peace between Great Britain and the United States at the close of the Revolution confirmed these grants of land to the town of Hunting-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ton, and that the various Constitutions of the state of New York, in the years 1777, 1821, 1846, and 1894, have provided that all grants made by authority of the king of Great Britain or his predecessors, or charters to bodies politic or corporate, by him or persons acting with his authority, shall be valid and not affected by any of the provisions of said constitutions, if said charters were made prior to October, 1775.

The charter granted by Gov. Nicolls gave not only property rights, but certain corporate or political franchises. It conveys certain lands, described by boundaries, with all "Havens Harbours Creekes Quarryes Woodland Meadowes Pastures Marshes Waters Lakes ffishing Hawking Hunting and ffowling And all other Proffitts, Commodityes, Emolumts, and Hereditamts * * * To have & to hold the said Lands and Necks of Lands Hereditamts and prmisses with their and every of their Appurtenances and of every Part & Parcell thereof to the said Patentees and their Associates their Heires Successors and Assignes forever." This conveyed the property and rights in the property itself.

But the charter also confirmed and granted unto the said patentees and their associates, their heirs, successors and assigns, "all the Priviledges belonging to a Towne within this Governmt and that the Place of their prsent Habitacon shall continue and retaine the Name of Huntington."

The charter of Gov. Dongan confirmed the first under substantially the same description, but provided for the creation of a body known as the "trustees of the freeholders and commonalty of the town of Huntington," with perpetual succession.

The third charter, from Gov. Fletcher, is again confirmatory of the two previous charters, and makes some changes in the boundaries, but has no bearing upon the question with which we have to deal.

These charters and the political rights granted thereby are referred to in the case of Lowndes v. Huntington, 153 U. S. 1, 14 Sup. Ct. 758, 38 L. Ed. 615. The particular question before the court in that case was as to the boundaries of the grants under these various charters, and as to whether a certain bay, known as Huntington Bay, was included within the properties and rights given to the town of Huntington. The court affirmed the decision of the court below, holding that the plaintiff, the town, was entitled to eject the defendant from the lands determined to be within the grants of these various charters, and also held (page 19 of 153 U. S., 14 Sup. Ct. 758, 38 L. Ed. 615) that the recognized rules of real property, both as to the rights attaching to certain lands within the territorial limits of the state and the extent and purposes to and for which the state might give the title and control of submerged lands, depended upon the settled law of the state. The law of the state, as to the extent of the rights given under these charters, is so thoroughly discussed, and the various cases referred to, in the opinion of Chief Justice Parker in People ex rel. Howell v. Jessup, 160 N. Y. 249, 54 N. E. 682, that they need not be discussed here. The Jessup Case decided that the title to the lands under water and the right of possession and control of

the waters in question were in the trustees of the town, "who had the right in their sovereign character to do in the discharge of their trust precisely what their predecessor sovereign could have done, or what the state, had it, instead of the town, succeeded to the title and rights of the English government, might have done, or may yet do, shall it hereafter so succeed, by an exercise of its right of eminent domain." But the court says (page 262 of 160 N. Y., page 686 of 54 N. E.), where it refers to the various cases in the Court of Appeals of New York upon the terms of these various charters, that "the trustees were invested with the power of management and authorized to perform such acts and make such orders, not repugnant to the laws of England, as they might see fit." The court took into consideration the proposition that a grant of land under water by the king 'to private individuals did not include the right of navigation (which rested in the crown with Parliament), but did include all conveyable rights expressly given by the grant, and that since the Revolution the states of this Union have succeeded to the rights of both crown and Parliament in navigable waters as well as in the soil, subject only to such charters as had been previously given. The court quotes the language of Chief Justice Taney from the case of Martin v. Waddell, 16 Pet. 412, 10 L. Ed. 997, where he says as to a similar charter:

"It is not a deed conveying private property, to be interpreted by the rules applicable to cases of that description. It was an instrument upon which was to be founded the institutions of a great political community; and in that light it should be regarded and construed."

And the Court of Appeals says:

"We could, guided by this rule alone, quite readily reach the conclusion that the letters patent were broad enough in terms to grant to the trustees of the freeholders and commonalty of the town of Southampton not only lands under the waters, but the sovereignty over the waters itself for the benefit of the freeholders and inhabitants of the town, to such extent at least as would enable them to authorize such a construction as that involved in this action."

The construction involved in that action was the maintenance of a bridge over waters held by the court not to be navigable. But, even if those waters were navigable, the Court of Appeals held that the charters referred to were broad enough to give the town authority over such structures, subject only to the rights of the United States (Kerr v. West Shore R. R. Co., 127 N. Y. 269, 27 N. E. 833), using the following language:

"The sovereign authority may authorize the construction of bridges, piers, * * * or other obstructions in navigable waters; and, when such obstructions are not obnoxious to the regulations of Congress and do not come in conflict with the paramount authority of the United States, they are not nuisances."

The right of the United States to exercise jurisdiction in matters relating to navigable waters has been further upheld in the case of Blue Point Oyster Co. v. Briggs, 198 N. Y. 287, 91 N. E. 846, so far as charters from the sovereign to individuals are concerned.

It is impossible to see what difference there would be between a grant from the sovereign to certain individuals and from the sovereign

to trustees or to a community exercising limited rights under the sovereignty.

We need not here consider whether the patent to the Duke of York, discussed in the Waddell Case, reserved all of the same powers to the crown of England as were reserved in the grants by the colonial governors to the town of Huntington, for it is apparent, as recognized by the decisions of the Court of Appeals of New York and by the language of the charters themselves, that there was no intention of giving to the town of Huntington the rights of an independent government, but merely that of an independent and self-governing township, under the protection of the realm and subject to the general laws of the realm, where they did not conflict with the freedom or private rights and public privileges which were vested in the beneficiary under these charters. The court will take judicial notice of the fact that the Great South Bay and its tributaries are navigable as arms of the sea, and hence that the waters in which the Stella B was operating were navigable waters at the time of the occurrence. Being navigable waters and there being nothing in the colonial charters cited which put the township outside the general jurisdiction of the government under which the town existed and to which general jurisdiction the state of New York and the United States have legally succeeded, it must be held that the laws of the United States regulating navigation are applicable to and binding upon all craft within the limits of the town of Huntington in the same way in which they are binding upon vessels elsewhere. The point as to the jurisdiction must be decided in favor of the United States.

The statute in question says:

"Preamble.

"Whereas the provisions of chapter eight hundred and two of the laws of eighteen hundred and ninety, and the amendments thereto, adopting regulations for preventing collisions at sea, apply to all waters of the United States connected with the high seas navigable by seagoing vessels, except so far as the navigation of any harbor, river, or inland waters is regulated by special rules duly made by local authority; and

"Whereas it is desirable that the regulations relating to the navigation of all harbors, rivers, and inland waters of the United States except the Great Lakes * * * shall be stated in one act: Therefore

"Be it enacted," etc. Act June 7, 1897, c. 4, 30 Stat. 96 (U. S. Comp. St. 1901, p. 2875).

Then follow the provisions as to lights, and by section 4 of said act it is provided that a vessel "navigated without complying with the provisions of this act shall be liable to a penalty of two hundred dollars, one-half to go to the informer, for which sum the vessel so navigated shall be liable and may be seized and proceeded against by action in any district court of the United States having jurisdiction of the offense."

The claimant makes the further contention that, inasmuch as the statute contains the provision as to local rules, the United States cannot through its attorney attempt to collect the penalties incurred, and that, if there be jurisdiction and if the boat be liable for the penalty specified, then such penalty belongs to the local district for which the rules are adopted, and the present action should be dismissed as not

properly instituted. This contention disregards, however, the plain meaning of the statute in providing a penalty for any violation. Congress may allow some local organization or district to prescribe rules, and those rules may prevail when they are not in conflict with the statutes of Congress; or Congress may pass laws which shall be in effect recognized as local rules, as in the present case. But a general penalty provided by a law of Congress, and not particularly specifying that the penalty shall go to somebody else, must carry with it the payment of the penalty into the treasury of the United States. Its subsequent disposal, or whether some one may be entitled thereto at the hands of the United States, cannot affect the form of the action under which the penalty should be sought to be recovered.

The libelant should recover, and may have a decree.