In the Matter of the CITY OF NEW YORK, Respondent, Relative to Acquiring Title to Real Property Required as a Site for the Proposed Hunts Point Sewage Treatment Works, in the Borough of The Bronx. AMERICAN PRESIDENT LINES, LTD., Appellant.

First Department, February 24, 1953.

*Earl Q. Kullman* of counsel (*H. Maurice Fridlund* and *Walter Egan* with him on the brief; *Kirlin, Campbell & Keating,* attorneys), for appellant.

*Reuben Levy* of counsel (*Harry E. O'Donnell, Benjamin Offner* and *Leo Sachnoff* with him on the brief; *Denis M. Hurley, Corporation Counsel,* attorney), for respondent.

*Joseph V. McKee* of counsel (*John O'Malley* with him on the brief), for Title Guarantee and Trust Company, *amicus curiæ.*

CALLAHAN, J.  This appeal is from a decree in a condemnation proceeding, which determined that the City of New York and not the claimant had title to certain lands under water on the shorefront of the East River or Sound in the borough of The Bronx, city of New York, west of the Bronx River.  The land is outshore of the highwater mark, and between it and the pierhead and bulkhead lines created by law.  Decision of the questions raised depends largely upon the construction to be given to various colonial patents to predecessors in title of the claimant and to the former Town of Westchester.  The city has succeeded to the former interests of Westchester. There are also involved grants of more recent date by the State of New York affecting land under water.

The property in question is located on the headland or neck of land commonly known as Hunts Point, and more particularly in a cove or bay of the East River or Sound on such headland between the extreme tip of the point and a second point to the west thereof, known as Barretto Point.

According to the city, the mouth of this bay or cove is approximately 2,650 feet wide, if measured by a line from the tip of Hunts Point to that of Barretto Point, and 2,330 feet in depth inshore on a line perpendicular to that line at the deepest point of the cove. It appears, however, that the measurement as to the depth, disregards extensive mud flats and marshes, and the greatest depth of the open water of the cove in ordinary tides would appear to be about 1,450 feet. In fact, on any map, except one of detailed scale, the open bay appears to be little more than an indentation or curvature of the shoreline of the Sound on the Hunts Point headland. Its shores are largely marshland and mudflats, which are washed directly by the daily tides of the Sound itself, and it appears to furnish no protection as a harbor. Two little creeks run into this cove, which are not shown to be subject to the ebb and flow of the tides.

We have described the bay or cove somewhat in detail, because its form and character play an important part in the decision to be made.

In *Bliss* v. *Benedict* (202 App. Div. 115, affd. 234 N. Y. 596), this court considered a question of title in another bay east of the Bronx River between Classon Point and Old Ferry Point, and held that title to all land under water therein north of a line drawn between these headlands was in the City of New York as successor under a colonial grant to one Quimby and others as trustees for the Town of Westchester. One of the principal questions that arises here is whether any rule of law was laid down in *Bliss* v. *Benedict* case (*supra*), which is controlling as to the *locus in quo*.

There have also been cited to us two decisions of this court in *Matter of City of New York* (*Lafayette Ave.*) (259 App. Div. 987) and *Matter of City of New York* (*Schurz Ave.*) (278 App. Div. 309) decided since *Bliss* v. *Benedict,* involving questions of title to land under water in adjacent or nearby bays or rivers which require consideration.

The cases cited, however, all referred to localities east of the Bronx River. This appears to be the first case in which the claim has been presented to this court that the Quimby and subsequent grants to the Town of Westchester conveyed title

to bays along the shorefront of the Sound west of the Bronx River in areas where the upland was granted to other patentees.

The claimant contends that the Quimby grants were conditional on obtaining deeds from the Indians, and that because of breach of this condition west of the Bronx River and for other reasons Westchester recognized at an early date that it had no title to land as contrasted with governmental jurisdiction in that area. The city contends that the grant to Westchester ran to the Harlem River and the town obtained all lands including the bays of the Sound within that area not expressly patented to others.

The source of the claimant's record title will be set forth first, the documents being referred to chronologically. An Indian deed to Edward Jessup and John Richardson, dated March 12, 1663, contained the following description: " a certain Tract of land bounded on the east by the River Aquehung or [Bronx] to the midst of the River, on the northward by the trees marked, &c., by a piece of hassock meadow, westward by a little brook called Sackwrahung, southward by the sea with a neck of land called Quinnahung, with all the meadows, &c., uplands, Trees, &c., whatever else besides bee upon ye said parcell of lands with all other commodities belonging to the same quietly to possess ".

This description covers the whole of the headland or neck of land from the Bronx River to a point west of the *locus in quo* and is commonly referred to as the West Farms purchase. It includes all of Hunts Point and Barretto Point.

This Indian deed, which conferred no title, was followed by two patents from the Colonial Governor Richard Nicolls, both dated April 25, 1666, one to Jessup and the other to Richardson. The Jessup patent read: " Whereas there is a Certaine Parcell or Tract of Land within this Government lying and being neare the Towne of West-Chester Bounded on the East by the River commonly called by the Indyans Aquehung otherwise Bronckses River to the Midst of the said River Northward by the marked Trees and by a piece of Hassock Meadow westward by a little Brooke called Sackrorahung and Southward by the Sea with a Neck of Land called Quinnahung which said Parcell or Tract of Land with the Appurtences hath heretofore been joyntly Purchased of the Indyan Proprietors by Edward Jessop and John Richardson of West Chester aforesaid and due Satisfaction given for the same as by the Deed remaining upon Record more at Large doth and may Appeare Now it being mutually agreed unto by both the aforesaid joynt Purchasrs that an

equall Division shall bee made of the said Parcell or Tract of Land betweene them the said Edward Jessop and John Richardson their Heires and Assignes And to the end of the said Lands may bee the better Manured & Planted ffor a further Confirmacon unto each and either of them in their Possession and Enjoyment of the prmisses Know Yee That by vertue of the Commission and Authority given unto mee by his Royall Highnesse the Duke of Yorke I have thought fitt to ratify Confirme and Graunt and by these prsents do ratify Confirme and Graunt unto Edward Jessop aforesaid his Heires and Assignes the Moyety or one halfe of the fore menconed Parcell or Tract of Land together with the Moyety or one halfe of all the Woods Meadowes Pastures or Marshes there unto belonging wth their and every of their Appurtenances and of every Part and Parcell thereof To have and to hold ''.

The Richardson patent was to the same effect, but the appurtenance clause read: '' Together with the Moyety or one-half of all the Woods Meadowes Pastures — Comonage Marshes Waters Rivers or Lakes thereunto belonging with their & every of their appurtenances ''.

By these grants of undivided half interests to Richardson and Jessup, they acquired the entire property, at least as to the upland.

Chronologically, the patent to Quimby and others, dated February 15, 1667, and commonly known as the Westchester patent followed next, but we discuss this later and continue with claimant's title.

The patents to Richardson and Jessup were further confirmed by a patent to one Thomas Hunt, Jr., who had succeeded to the interests of Jessup. It was dated January 12, 1686, and the material part thereof read: '' Whereas Thomas Hunt Junior of Westchester Stands Seized of an Estate in fee Simple in one Messuage or Tennem:ts & the Mojety or one halfe of a Certaine Parcell or Tract of Land with the Appurtenances Scituate lyeing & Being in the County of Westchester near the Town of Bronckes River Commonly called by the Indians Aquechung in Westchester aforesaid which said Parcell or Tract of Land is Bounded on the East by the River (that is to say) by the midst of the said River on the North by Certaine marked Trees & a Peice of Hassock Meadow on the West by a Certaine Brook Called by the Indians Sakwrahung & on the South by the Sound as also in the Mojety or one halfe of the Neck of Land Called by the Indians Quinachung & on the South by the Sound Know Ye that by Virtue of the Commission &

Authority from his most Sacred Majesty & Power in me being & Resideing in Consideracon of the Quitt Rent herein after Reserved & other Good & Lawfull Consideracon me thereunto moveing I have Given Granted Ratified & Confirmed & by these Presents Doe hereby Give Grant Ratifie & Confirme unto the said Thomas Hunt Junior his Heires & Assignes forever all that the one halfe or Mojety of the said Parcell & Tract of Land & Premissess with all & every the Appurtennces together with all the Mojety or one halfe of all & Singuler Lands Meadows Meadow Grounds Marshes Pastures feedings Woods Woodland underwood Waters Ponds Runs Rivoletts hunting Hawking fishing fowleing & the Mojety or one halfe of all other the Proffitts Advantages henefitts Easements Emolum.ts & Hereditam.ts to the said Parcell or Tract of Land & Premissess belonging or in any wayes Appurtaineing To Have & To Hold ''.

It is to be noted that the southerly boundary of these patents was the '' sea '' or the '' sound ''. Both references are to the body of water which is today known as the East River or Long Island Sound.

Reference to the maps of this territory will also show that the upland granted runs from the Bronx River westerly. There seems to be some dispute as to the identity of the creek referred to in the original Jessup and Richardson patents as '' Sackwrahung '' and given as a westerly boundary of the grant. The city now appears to claim that it is the creek running into the cove in dispute and called '' Sacrahong '' Creek on some of the more modern maps. The evidence would indicate, however, that the original patents intended to refer to the creek opposite North Brothers Island more recently called Bungay Creek or the creek west of Barretto Point known as Leggetts Creek. The patentees of Morrisania to the west asserted that the Jessup and Richardson patents ran only to Leggetts Creek and appear to have succeeded in maintaining this claim. (2 Bolton on History of Westchester, p. 439; Jenkins on The Story of The Bronx, pp. 42, 43, 381.) In any event Sackwrahung Creek in the Jessup grant would appear to refer to a creek west of Barretto Point, and not the Sacrahong in the cove.

We note also that there appears to be some question as to whether the neck of land referred to in the descriptions as '' Quinnahung '' is Barretto Point or the whole headland or neck of land, which we originally referred to as Hunts Point.

The patentees in early conveyances executed by them referred to the '' Long Neck '', the '' Planting Neck '', but not to the Quinnahung Neck.

The claimant also relies on two grants of land under water from the State of New York. The first ran to Susan B. Spofford and others, dated November 29, 1871. The second to Henry C. Barretto and others, dated September 29, 1873. These refer to two separate parts of the area in dispute, which by that time were in separate ownership.

Accordingly, the claimants assert that if they did not acquire the land under water through the original patent (Jessup and Richardson), they did acquire it through the grants from the State of New York to Spofford and Barretto. The correctness of the latter claim, however, would depend on whether the land under water had previously been granted by colonial patents to the Town of Westchester. If Westchester had so acquired it, then the city's title would prevail.

We will now turn to the Quimby and other patents, on which the claim of the city's title depends.

In construing these patents we will assume for the purposes of this decision that, with respect to any land under water acquired by the Town of Westchester, it was held in its corporate capacity or as a town (*Matter of City of New York [West Farms Road]*, 212 N. Y. 325). But, for reasons which will later appear, this does not mean that the Westchester patent must, because of the purpose of the grant, be construed as broadly as the city contends.

Before examining the Quimby patent, it might be well to get a broader picture of the other patents of properties along the shore front of the Sound. A prior patent of Cornells Neck or Classon Point had been granted to one William Willett, a patent had been granted of the Grove Farm on Brocketts Neck now known as Old Ferry Point, and a third granted to one Townsend, embracing an area on the east side of Throggs Neck. These were all of territory east of the Bronx River. The Quimby patent was followed chronologically by patents to Turner of the area near the Harlem River at Macombs Dam, the patent to Archer for the Fordham area, and the patent to Edsall for Morrisania. These patents, plus the one to Jessup and Richardson, left but two areas of the shorefront along the Sound of what is now the County of Bronx, as to which the upland had not been granted to others, i.e., the Castle Point area and a portion of the Throggs Neck area.

We are concerned with a claim that the Town of Westchester received land under water in a bay or on the shore of an area where the upland was granted to Jessup and Richardson prior to the grant to Quimby. To uphold the claim of the city

we must find that it was the intent of the Crown to give the upland to Jessup and Richardson, but to give the bay or the immediate foreshore to the Town of Westchester, in other words, that the bay or cove was not included in the Jessup and Richardson grant, but included in the Quimby grant. The Quimby patent read:

" Whereas, There is a certain Town within this Government, situate lying and being upon the Main [land] to the east of Harlem River, commonly called and known by the name Westchester, which said Town belongs to the North Riding of Yorkshire upon Long Island, and is now in the tenure or occupation of several freeholders and inhabitants, who, having heretofore been seated there by authority, have been at considerable charge in manuring and planting part of the Lands belonging thereunto, and have likewise settled a competent number of families thereupon for a Township;

" Now, for a confirmation unto the said freeholders and inhabitants in their possession and enjoyment of the premises, as also for an encouragement to them in their further improvement of their lands and premises.

" Know Ye, That by virtue of the commission and authority unto me given by his Royal Highness, I have given, ratified, confirmed and granted, and by these presents do give, ratify, confirm and grant unto John Quimbe, John Ferris, Nicholas Bayly, William Betts and Edward Waters, as Patentees, for and on the behalf of themselves and their Associates, the Freeholders and Inhabitants of the said Town, their heirs, successors and assigns,

" All that Tract of Land, together with the several parcels not otherwise by Patent disposed of, which already have or hereafter shall be purchased or procured for and on the behalf of the said Town, whether from the native Indian Proprietors or others, within the bounds and limits hereafter set forth and expressed (vizt), That is to say:

" The Western Bounds of the lands lying within the limits of the said Town to begin at the west part of the Land commonly called Bronckx Land, near or adjoining unto Harlem River;

"From whence they extend Eastward to the west part of a certain Neck of Land commonly called Anne hooks Neck or Mr. Pell's Purchase;

" Southward they are bounded by the Sound or East River;
" And so run upon a parallel line from the east and west limits, North into the woods, without limitation for range of cattle or other improvement,

" Together with all the Lands, Soils, Necks of Lands, Rivers, Creeks, Harbors, Quarries, Woods, Meadows, Pastures, Marshes, Waters, Lakes, Fishing, Hawking, Hunting and Fowling, and all other profits, commodities, emoluments and hereditaments to the said Land and premises within the said bounds and limits described and set forth belonging or in any wise appertaining.

" To Have and to Hold all and singular the said Tract and parcels of Land, hereditaments and premises, with their and every of their appurtenances and of every part and parcel thereof to the said Patentees, and their Associates, their heirs, successors and assigns, to the proper use and behoof of the said Patentees and their Associates, their heirs, successors and assigns for ever.

" Moreover, I do hereby give, ratify, confirm and grant unto the said Patentees and their Associates, their heirs, successors and assigns, all the rights and privileges belonging to a Town within this Government, and that the place of their present habitation shall continue and retain the name of Westchester, by which name and style it shall be distinguished and known in all bargains and sales, deed, writings and records."

This patent was followed by two confirmatory patents to the Town of Westchester, one of January 6, 1686, by Governor Dongan, and the second dated April 16, 1697, by Governor Fletcher. In both of these the southerly boundary of the grant was described as the Sound or East River and the westerly boundary the west part of Broncks Land near or adjoining to the Harlem River; each referred to the prior Nicolls patent and contained like appurtenance clauses referring to the river creeks and harbours, etc., within the area. The grantees were not the same individuals in each patent, but included additional or new inhabitants or freeholders of the Town of Westchester. The Dongan patent designated the grantees as a " Body corporate and Politique", and the Fletcher patent provided for the creation of a Mayor, aldermen and common council of the Borough and Town of Westchester and named the town officers.

The Dongan confirmatory patent repeated the exception contained in the Nicolls patent as to all lands by patents otherwise disposed of, and the condition that land was to be purchased or procured for or on behalf of the town from the Indians or

others. The Fletcher patent, while it omitted express words as to otherwise patented land, showed by its language that it referred to lands then in the tenure of the patentees and other freeholders of Westchester and, further, in excluding rights of commonage, it noted that persons within the limits of the town other than the Westchester patentees had particular grants or patents. The requirement in the Nicolls grant of securing deeds from the Indians was recognized in the Dongan patent, but not in the Fletcher patent.

It is plain from the mass of historical data submitted by diligent counsel on both sides that from the beginning there was a dispute between the Westchester patentees and those who received particular patents of land west of the Bronx River as to whether Westchester had any proprietary title to land as distinguished from governmental jurisdiction in the area west of the Bronx River. The dispute apparently involved the nature of the title of the trustees, the express exclusion of Westchester from rights granted to the private patentees, and the alleged forfeiture by Westchester for failure to get deeds from the Indians for property west of Bronx River.

Historical documents in evidence (Minutes, Supreme Court of Judicature, Coll. N. Y. Hist. Soc. in Matter of Selinus v. Westchester, Marshall v. Richardson, White v. Town of Westchester, Town Record of Minutes, Town of Westchester) indicate that these disputes commenced almost immediately and continued for years. (See, also, Melick on The Manor of Fordham and Its Founder [Fordham University Press], 1950.) As early as 1692, litigation arose between successors to the Fordham patentees and the Westchester patentees. At first, Westchester appeared victorious, then the Fordham patentees. Though the history of the litigation is somewhat obscure, it at least appears that the parties settled their differences by making the Bronx River the dividing line as to any claim to property in the Fordham grant, and a quitclaim deed was executed to that effect.

That there was no claim asserted by Westchester as to any of the lands involved in the West Farms patents is confirmed by proof of the adoption of a resolution by the Town of Westchester on January 1, 1686. The resolution excluded these patentees from any share in Westchester common lands, but required them to contribute to taxes. Thomas Hunt, as the successor to Jessup, was recognized by the resolution as owning an interest in the West Farms patent with which we are

concerned. No exception was contained in the resolution as to any claim of title to bays or tideway along the Sound adjoining the Hunt patent.

Notation of the dates of the Dongan confirmatory patents to the Town of Westchester on January 6, 1686, and that to Thomas Hunt of the *locus in quo* on January 12, 1686, both of which followed within days the aforesaid town's resolution, indicates also that there was a reaffirmation at that time by the Crown of the superiority of title in Hunt over that of the town as to all property within Hunt's patent. Again, no exception was made of the bays or tideway. In fact, the confirmatory patent to Hunt broadened the appurtenance clause of the prior Jessup patent so as to include waters, ponds, runs, rivoletts, etc., not previously referred to in the Jessup patent, though some were mentioned in the Richardson patent.

There are other resolutions in the town minutes showing that Westchester continued to assert claims of title, however, to unassigned lands west of the Bronx River after the termination of the Fordham litigation and after the adoption of the resolution referred to, but we find no claim made of title to any of the area within the West Farms patents nor any claim to the foreshore adjacent thereto.

This early conflict as to title to land west of the Bronx River was discussed at some length in *Matter of City of New York* (127 Misc. 710). That case involved lands under Cromwell Creek, which was a branch of the Harlem River or a stream entering same in a part of the area contained in the Edsall or Morrisania patent near Macombs Dam. It thus was, perhaps, a stronger case for the city than the present case in that the Edsall or Morrisania patent postdated the Quimby patent, and the land was under a creek or river. Special Term held that the claimant under the Morrisania patent, and not the city, had title to the land in question. The city did not appeal.

We find considerable support for the claimant's contentions that although the wording of patents to the Town of Westchester would seem to extend them to the Harlem River, the town was eventually content to confine its claims to governmental jurisdiction rather than proprietary title to lands west of the Bronx River.

However, we do not need to decide whether the Westchester patents have no application west of the Bronx River. As we view the case, the result would be the same if these patents did extend to the Harlem River, excluding of course, land

otherwise patented. We proceed to the further questions in the case on the assumption, therefore, that the town patents did extend to the area in suit.

We will first discuss the contention of the parties as to certain rules of construction they seek to have apply to the patents.

The city contends that we must construe the patents to the Town of Westchester more liberally than the private patents so as to include the bays in the former, (1) because of the public purpose of the grant, and (2) because of the broader appurtenance clauses.

The claimant cites to us the leading cases of *Rogers* v. *Jones* (1 Wend. 237) and *Trustees of Brookhaven* v. *Strong* (60 N. Y. 56) for the proposition that where a grant conveys a tract described by metes and bounds, the land under water as well as other land will pass if it is within the limits of the grant. It then proceeds to argue that as the Crown could grant land under water to private patentees as well as to a town, and as the southern boundaries were the same in both classes of patents, the word " Sound " must be deemed to refer to the same body of water with the same limits in all patents. It concludes that private patentees, whose grants preceded those of the town, must be deemed to have received all of the area inshore of a line between the headlands in any bay or cove, if the " headland to headland " rule is to be applied in fixing the limits of the " Sound ". But this reasoning, of course, leaves open the question as to what are the limits of the Sound, and whether a " headland to headland " rule is to be applied to the bay or cove in question.

There is a general rule of construction that Crown patents as distinguished from Royal Colonial Charters are to be strictly construed in favor of the Crown and against the patentees (*De Lancey* v. *Piepgras*, 138 N. Y. 26).

It has been suggested in some decisions that the rigidity of this rule is sometimes relaxed in favor of municipalities, though never in favor of private patentees (*People* v. *Foote*, 242 App. Div. 162). Whether there is any substantial basis for such difference in treatment, we consider academic.

The question of strictness of construction arises only when there is uncertainty and ambiguity in the wording of the patents (*Langdon* v. *Mayor, etc., of City of New York*, 93 N. Y. 129). We find no such ambiguity here as to what we consider the controlling factor, to wit, the description fixing the limits of the grant. The southern limit is the " Sound " in all the patents

involved. The word " Sound " is used to describe a particular body of water. Its description is geographical, and its identity an historical matter to be factually decided.

In instances where contemporaneous patents of Long Island areas were construed to grant title to certain bays, the decisions have been based on the finding that the bays constituted separate and independent bodies of water and, therefore, were not a part of the " Sound " (*Lowndes* v. *Huntington,* 153 U. S. 1; *Rogers* v. *Jones,* 1 Wend. 237, *supra*; *Trustees of Brookhaven* v. *Strong,* 60 N. Y. 56; *Robins* v. *Ackerly,* 91 N. Y. 98; *Tiffany* v. *Town of Oyster Bay,* 209 N. Y. 1; *Grace* v. *Town of North Hempstead,* 166 App. Div. 844, affd. 220 N. Y. 628). The word " Sound " did not receive any special meaning in these decisions because of any particular rule of construction based upon the purpose of the grant.

With respect to the city's second contention that the broader appurtenance clause warrants a finding that the bays or coves were granted to the Town of Westchester and not granted to the private patentees, it might be well to note that we find no mention of the word " bays " among the appurtenances in the patent to the Town of Westchester, although Special Term did refer to bays as being included therein. The appurtenance clauses in the town grants did include rivers, creeks and harbors.

But this bay is neither a river, a creek, nor a harbor, and in any event the cases last cited do not justify extending the limits of the grant because of the nature of the appurtenance clauses. The answer to any such contention is found in *Lowndes* v. *Town of Huntington* (153 U. S. 1, 22, *supra*) where the court said: " whenever we are considering the matter of boundary we naturally turn to the words by which the boundary is described, and accept those words as controlling, and do not look to those by which the scrivener attempts to define that which is to pass with the granted premises as appurtenant thereto, to see what is omitted therefrom, or what is uncertain therein." The broader appurtenance clause, therefore, while it might help to determine what was granted within the boundary limits, would not be used to extend those limits.

However, if we should find that a " headland to headland " rule is not to be applied, and that the Sound extended to the shores of the bay or cove in question, there might arise a second question concerning the construction of the two classes of patents with regard to the tideway or land between the high and low water, based on the purpose of the grant.

The general rule is that where the boundary of a Crown grant is a body of navigable water, it runs from the high water mark. It was said in *Matter of Mayor, etc., of New York* (182 N. Y. 361, 365): "While the king had the power to convey the tideway on the shores of the high seas and navigable rivers, he will not be presumed to have done so by merely bounding the conveyance upon the sea or the river; such conveyance will carry title only to high-water mark. Other words must be employed in the conveyance which would clearly indicate his purpose and intent to convey the lands under water in order to pass the title thereto." (See, also, *Sage* v. *Mayor, etc., of New York*, 154 N. Y. 61.)

The purpose of the Westchester patents was not to grant this vast area to a municipality concerned with maritime interests such as the development of a city's waterfront as an aid to commerce and navigation. The Town of Westchester was a territory wherein those interested in agriculture were wresting the lands from the forest for settlement. The patents expressly noted that the settlors or freeholders had been "at considerable charge in manuring and planting some of the lands". A patent to a town in such a rural area would not be construed to imply that the Crown intended to grant the tideway to the patentees. It was so decided with respect to a patent to the Town of Harlem, which was on Manhattan Island, and thus even nearer to the then city of New York, the center of commerce in the area (see *Mayor, etc., of City of New York* v. *Hart*, 95 N. Y. 443).

If there had been an intention to grant to the Town of Westchester the tideway in front of the land granted to Jessup and Richardson, some language would have been used to show such intention. Instead, a broad provision was inserted in the town patents excluding any rights in tracts that had been previously patented. In a contemporary patent, to wit, the Dongan patent of 1686, granting to the City of New York the shorefront or tideway of Manhattan Island, the Crown explicitly provided for title to low water.

It should sufficiently appear from the foregoing that the grant to the Town of Westchester is not to be construed as including the land in the bay or cove, or even that in the tideway, upon any rule of more favorable construction of the town grant in favor of the city.

This brings us to *Bliss* v. *Benedict* (202 App. Div. 115, affd. 234 N. Y. 596, *supra*) and whether there is any "headland to headland" rule pronounced in that decision which requires us

to hold that the " Sound " in this area ended and the grants began at a line drawn between Hunts Point and Barretto Point. Unless the city sustains this contention, it would seem that neither the claimant nor the city received the land under the water of the bay or the tideway in question. The State of New York as successor to the Crown would have had title to this land and the claimant, who succeeded to the title of the State, would be entitled to an award of damages for the taking.

The decision in *Bliss* v. *Benedict* (*supra*) in our opinion did not announce any general principle requiring a line to be drawn across the mouth of every bay or cove to fix the limits of the Sound. That decision rested on a factual finding that the land in that case was under Westchester Creek, a body of water independent of and north of the Sound. It involved a situation where there were two private patents of large areas of land immediately adjacent to and on either side of a bay, into which two anciently recognized navigable and tidal rivers flowed. These rivers were many times wider and longer than the two little creeks involved in this case. Westchester Creek would appear to be about 1,200 feet wide at its mouth at flood tide. It ran inland three or more miles. Pugsley Creek was said to be about 800 feet wide at its mouth and ran inland about a mile. The present two small creeks are about 25 feet wide, run but a relatively short distance inland, and flow separately into the Sound. The bay in *Bliss* v. *Benedict* (*supra*) was 2,790 feet wide at its mouth measured by a line between the headlands. The headland on the west, later known as Classon Point, had been granted to one Cornell under an earlier patent. That on the east, later known as Old Ferry Point, had been granted under the so-called Grove Farm Patent to one Throckmorton and confirmed to one Thomas Hunt, Sr. Both of these patents preceded that to Quimby. The land under water, though claimed by one holding adjacent upland under the Cornell patent, was not claimed under that patent or as an appurtenance to the upland, but under a later grant from the State of New York. That grant from the State, however, recited that the land granted was under Westchester Creek. In fact, these waters had been called Westchester Creek in many instruments and on many maps.

In the direct center between the headlands referred to in *Bliss* v. *Benedict* (*supra*) and facing the opening or mouth of the bay and 1,820 feet inshore, was a third headland, Castle Point, which had been granted to the Town of Westchester. Castle Point was bounded by Pugsley Creek on the west and

Westchester Creek on the east. Both were navigable, and neither had been conveyed to private patentees. The waters of these streams came together at Castle Point, and then flowed to the Sound. The land in dispute was land under water at a point 1,120 feet north of Classon Point and 700 feet south of Castle Point. This court held that that land was under Westchester Creek. It found that the so-called bay was in fact the confluence of the two streams, that the larger, Westchester Creek prevailed, and the waters continued to be Westchester Creek until it reached the line between the headlands.

Thus, it was held in that case that the city took as successor to the Town of Westchester, because the land was under a river, an independent body of water which was north of the Sound and within the limits granted to the town. The original findings and conclusions in *Bliss* v. *Benedict* (*supra*) and the changes made therein are quite enlightening as to the basis of the court's decision. The real dispute in *Bliss* v. *Benedict* (*supra*) was whether the river ended and the Sound began at the end of Castle Point or at a line between the headlands further south.

Numerous cases were cited in *Bliss* v. *Benedict* (*supra*) cases which we have heretofore referred to, concerning patents to lands under water on the Long Island side of the Sound, in which the Sound was defined as the open body of water between Long Island and the mainland to the north, and thus did not include the independent bays connected therewith. Based on the language used in this court's opinion and the reference to those Long Island cases, the city claims that a so-called " headland to headland " rule was created, and the city now seeks to construe that as a general rule to be applied in every case of a bay or cove along the Sound irrespective of its being recognized as a separate or independent body of water. *Bliss* v. *Benedict* (*supra*) and the cases cited therein, laid down no such broad principle, and none which is controlling on the facts of this case.

These cases held that certain bodies of water opening into the " Sound ", to wit, a certain river in the first case and various bays in the others, were distinctive bodies of water that had been recognized as independent and separate of the " Sound " at the time of the patents. The reference in the cases to a line between headlands was with relation to the fixation of the line where the two bodies of water met. The drawing of a line for such purpose is not to be distorted into a rule requiring that such a line is to be drawn whenever the contour of the shore of the " Sound " makes it possible to do

so in order to create two separate bodies of water that never had been considered independent or separate. To attempt to apply a " headland to headland " rule in the case of every little bay on the shore of a headland would entirely ignore the basis of the prior decisions. The gist of those decisions is disclosed by the following quotation from the principal case, which was *Lowndes* v. *Huntington* (153 U. S. 1, 23): " So the question is not whether this body of water in which the tract in controversy is situated is strictly a harbor or a bay, but whether it is neither, and only a part of the Sound. If it was then known as an independent body of water, by whatsoever name called, that is enough to eliminate it in tracing the boundary of the grant. That it was so known is not open to question; it was not, therefore, a part of the Sound, and the boundary of the grant ran on the north of it."

Thus, the cases simply determined the limits of the " Sound " by excluding waters, though connected, which were considered separate and independent bodies of water at the time.

Here we have no body of water known as a separate river, which could be said to maintain its identity as such until it passed a line drawn from Hunts Point to Barretto Point, a body of water to which a particular name distinctive from the Sound was assigned historically or in any conveyances. We could hardly conceive anyone describing the bay in question as Sacrahong Creek or Causeway Creek. These features distinguish the present case from *Bliss* v. *Benedict* (*supra*).

Nor is the present bay comparable in size, contour, separability or distinctive designation to the bays involved in Long Island cases. The latter were bodies of water which ran in for miles and were anciently known by particular names, such as Little Neck, Cow or Manhasset Bays, Hempstead Bay, Oyster Bay, Cold Spring Harbor, etc. The present bay is a comparatively small bay or cove on a headland, and not as deep as it is broad at the mouth. It does not appear that it was ever known as a separate body of water, and has always seemed to have been treated as a mere curvature of the shore of the " Sound ".

Another point of distinction in the present case is that here we have had no long continued exercise of control of these submerged lands on the part of the Town of Westchester or its successor, the City of New York. Not only has there been no attempted control, but at least in modern times the city has continuously taxed the area as land in private ownership. Furthermore, the City of New York on one occasion brought an

action to recover the value of fill placed by the city on certain lands immediately adjacent to one of the present damage parcels and involved in the same chain of title, thus asserting title to be in private ownership (*City of New York* v. *Bronx Terminal Corp., New York County Clerk's No. 30225–1921*).

We find that the "Sound" in both classes of patents involved in this case meant the body of water extending to the shores of the bay or cove. We find also that the patents to Jessup and Richardson ran from high water of the bay, and no part of the land under the waters of the bay went to the town. Accordingly, title to the lands in question was in the State until granted to the claimant.

Since the decision in *Bliss* v. *Benedict* (*supra*) we have decided *Matter of City of New York* (*Lafayette Ave.*) (259 App. Div. 987, *supra*) and *Matter of City of New York* (*Schurz Ave.*) (278 App. Div. 309, *supra*). They do not appear to hold anything contrary to this decision. The land under water involved in *Matter of City of New York* (*Lafayette Ave.*) was under the waters of the Bronx River and on the east side thereof, apparently where the upland was held by successors in title to the Town of Westchester. The Bronx River was a recognized river not a part of the Sound, and thus the case was controlled by *Bliss* v. *Benedict* (*supra*).

That portion of the land in *Matter of City of New York* (*Schurz Ave.*) (*supra*), title to which was found to be in the city, was under the water of Baxter Creek, which was on the boundary of the Throckmorton grant, but not included therein. Baxter Creek was a tidal stream for a short distance. The size and contour of the bay, and the minor influence of Baxter Creek therein, together with other circumstances, made it difficult, if not impossible, to fix the location of the place where the waters of Baxter Creek met those of the Sound by any line between headlands. It was clear, however, that as to land under the bed of Baxter Creek the city had title because the land was under a river north of the Sound. The sedge land or salt meadows, as to which we held title was to be in the claimant, being subject only to equinoctial and not neap tides, we found to be upland, passing under the Throckmorton patent.

We have considered the property owner's claim of *res judicata* based on a judgment in an earlier unreported case entitled *The Mayor of the City of New York* v. *East Bay Land & Improvement Co.* (Supreme Ct., New York Co., Dec. 11, 1899). This case involved the question of title to lands under water on the west side of Barretto Point and, therefore, not to the lands

in suit. The property involved in that suit, however, was within the area of the Jessup and Richardson grants, so that the source of title was the same. Having decided the issues upon the merits, we do not deem it necessary to discuss or determine whether the prior case would constitute an estoppel against the present claim of the city. It is sufficient to say that the earlier decision would seem to support our present findings under the rule of *stare decisis*.

This appeal involves damage parcels 20, 21 and 24. Damage parcel 20 consisted of upland as to which it was conceded that the claimant had title and for the taking of which an award was made. The appeal as to this parcel was taken solely because of the contention that claimant would have been awarded larger damages for conjunctive use if it had been held that it had title to adjoining pieces. Now that we have determined that the claimant has title, the amount of the damages by the taking must be fixed on a new trial. We have not, however, considered the question as to whether conjunctive ownership would increase the value of any parcel.

Damage parcel 24 was referred to on the trial as the " Gap ", the city first contending that the Spofford grants and the Barretto grants were not contiguous. The claimant asserted the contrary, and the wording of the grants would seem to bear out the claimant's contentions. In any event, a stipulation was entered into on the trial that the decision as to title to damage parcel 21 should control as to damage parcel 24, and upon the argument of this appeal the city likewise conceded that the claimant-appellant has title to parcel 24, if the city did not obtain title thereto as successor to the Town of Westchester.

Upon the new trial the amounts to be awarded for the three parcels involved in this appeal may be assessed.

The decree should be reversed, insofar as appealed from, and a new trial ordered.

PECK, P. J., VAN VOORHIS and BREITEL, JJ., concur.

Decree, so far as appealed from, unanimously reversed, with costs to the appellant and a new trial ordered. [See *post,* p. 882.]