Frank W. KOHLASCH, as Executor of the Last Will and Testament of Frank H. Kohlasch, Deceased, and Echo Bay Boat Yard, Inc., Plaintiffs,

v.

NEW YORK STATE THRUWAY AUTHORITY, Defendant and Third-Party Plaintiff,

v.

CITY OF NEW ROCHELLE, Third-Party Defendant.

76 Civil 4395.

United States District Court, S. D. New York.

June 25, 1981.

August C. Nimphius, Jr., White Plains, N. Y., for plaintiffs.

Dickerson, Reilly & Mullen, New York City, for defendant and third-party plaintiff New York State Thruway Authority; John H. Reilly, Jr., of counsel.

McGovern, Connelly & Davidson, New Rochelle, N. Y., for third-party defendant City of New Rochelle; Frank H. Connelly, Jr., New Rochelle, N. Y., of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

The path that this lengthy, tortuous litigation has followed commenced in 1976 and has resulted in a series of complaints, amended complaints, and third-party complaints in this Court and others. This Court has previously dismissed all but admiralty claims against both defendants, and as a result plaintiffs have been left in three courts with an assortment of claims.[1] The admiralty claims tried in this action are in a very real sense the narrowest of all.

Plaintiffs Frank W. Kohlasch (as executor of the estate of his father, Frank H. Kohlasch) and Echo Bay Boat Yard, Inc. (collectively referred to as "Kohlasch") are the owner and lessee respectively of real property abutting on navigable waters in the City of New Rochelle. There they have been engaged in the business of operating a boatyard for the storage, maintenance, and repair of boats, and a marina. They seek

---

1. One action is pending in the Supreme Court of the State of New York; the other in the New York State Court of Claims.

damages against both the New York State Thruway Authority ("Authority") and the City of New Rochelle ("City") allegedly sustained as the result of the discharge across their property of effluent consisting of oil, sand, debris, chemicals, and other substances from a drain on adjacent lands. They also seek permanent injunctive relief against the continuance of such conduct.

Originally, plaintiffs asserted five different claims for relief against each defendant (the City was made a party-defendant in this action a year after the Authority had filed a third-party complaint against the City). These included allegations of taking property without just compensation, obstruction of a navigable channel in violation of plaintiffs' navigational rights, erosion of a bulkhead on plaintiffs' land, pollution of surrounding waters, and malicious and intentional failure by the Authority to obtain required permits for the construction and maintenance of sewers and drains that discharge into navigable waters. In two separate opinions, familiarity with which is assumed,[2] this Court dismissed all but the claims based on the admiralty jurisdiction of the Court—that is, those alleging shoaling of the channel impairing navigational rights and pollution of the waters.

The Kohlasch property, which has been used as a boatyard and marina since 1947, is located at the westerly end of a channel in New Rochelle leading from Echo Bay, which is itself a part of Long Island Sound. Immediately upland from Kohlasch's property is Sentinel Oil Company, a portion of whose property abuts on the end of the channel; the property adjacent on the seaward side of the Kohlasch property is owned by the Nelstad Sand and Gravel Company (formerly Frost), which maintains docks where barges unload sand and gravel.

Frank H. Kohlasch bought his property at a tax sale from the City on June 27, 1946; Echo Bay Boat Yard, Inc. has been the lessee of the property since 1947.[3] The deed of sale given to Kohlasch by the City included in part certain land beyond the mean high water mark. Kohlasch thus maintains that he owns good title to that portion of the property, although both defendants contend, and devoted much of their efforts at trial to establish, that that property, being beyond mean high water, is owned by the State of New York and that the City conveyed to Kohlasch only any right, title, and interest it may have had.

In 1954, when the New Rochelle section of the thruway was built, the Authority constructed a drain or conduit through part of the City and connected it with portions of the City drain system. Since then drainage has been carried from the roadway and lands of the Authority and City streets. The drain extends through the City and terminates on the land of Sentinel Oil Company, from whom the Authority purchased a permanent easement. The opening of the drain on the Sentinel property from which material is discharged is located approximately 75′ from the property line between Sentinel and Kohlasch, is 3′ high and 9′ wide, and is a reinforced concrete box. The drain discharges over a concrete apron and then into a gully on Sentinel property.

This outfall, after it leaves the apron of the drain, flows beyond the Sentinel property line into the area beyond mean high water to which Kohlasch asserts title by virtue of the deed obtained at the tax sale in 1946. There is no dispute that the outfall travels across the lands described in that deed, nor is there an issue that no easement was ever purchased from Kohlasch for the path of the outfall over these lands.

The area of the Kohlasch boatyard immediately adjacent to the Sentinel property (and hence closest to the drain) currently consists of a submerged and filled-in barge which constitutes a bulkhead in the area beyond the mean high water mark. When the drain was originally built in 1954, Kohlasch had two floating barges in that area;

---

2. *Kohlasch v. New York State Thruway Authority*, 482 F.Supp. 721 (S.D.N.Y.1980); *id.*, 460 F.Supp. 956 (S.D.N.Y.1978).

3. The lessee appears to be wholly owned by the Kohlasch interests.

since then, however, the outer barge has been removed and the inner one filled in to become part of the land.

Immediately beyond this bulkhead, and about 200′ from the drain opening, there was at one time a marine railway used to haul boats in and out of the water. Beginning in 1977, Kohlasch removed the railway tracks and leveled the land around them because a buildup of muddy material over the tracks made it impossible to continue to use the tracks to haul. A crane is now used in place of the tracks to haul boats.

Beyond this area is the remainder of the Kohlasch property. The area beyond mean high water is used as a marina, although for nine or ten years up until it was dredged in 1978, it could not be so used.

The substance of the plaintiffs' complaint is that the defendants have collected drainage from the roadway and land of the Authority and the streets and lands of the City and directed such drainage over and across plaintiffs' property so as to deprive them of access to part of their property and in such a way as to shoal and make unnavigable the channel across part of their property. Defendants, on the other hand, contend that shoaling of the area adjacent to plaintiffs' boatyard and shoaling of the channel are caused by natural forces of tide and wind.

Although water does not always come out of the drain with great force, after a storm it does; indeed, Robert Kohlasch testified that it was sometimes "like Niagara Falls." Examination of the land immediately beyond the drain apron clearly supports this characterization.[4] A deep gully, between ten and fifteen feet deep, has been formed by the drainage. According to plaintiffs' expert, John Connors, most of this erosion occurred soon after the drain was installed. As water flows rapidly out of the uncovered drain into this gully, the heavier material settles out of the water first and the lighter material is carried along until the water slows down enough for it to settle to the bottom. By this process, material fills in the bottom of the channel.

Both Robert and Frank W. Kohlasch, the sons of the original owner, who were in business with and worked with their father, testified that they observed the construction of the drain in 1954 though they did not pay much attention to it at the time. However, after the drain was in place, they began having problems with the depth of the water in the boatyard. As noted above, mud and "soupy" material covered the marine railway. For a time they themselves tried to dig the railway out, but that became too big a chore. Thus, while they originally could haul three or four boats per high tide, after the railway filled in they could not always do so and sometimes had to moor boats in the channel and wait for moon tides, which are particularly high. Over the years since 1959, when part of the property was dredged, the basin around the marina filled in to such a degree that much of it was dry at low tide. This in turn reduced the capacity of the boatyard and hindered the process of putting boats back in the water at the end of winter; this was so because boats need several days in the water for the wood to expand, and freshly painted boats can be damaged when sitting on the exposed bottom.

The marina area was dredged again in 1978, but thereafter until 1980 that area filled in almost two feet. Kohlasch attributes this problem, as he does all the problems referred to above, to the discharge from the drain; indeed, Robert Kohlasch specifically testified that he believes that the severe problems faced by the boatyard began in 1954 with the construction of the drain and have grown more severe since then.

As the person who dredged the marina area for Kohlasch in 1978 testified, most shore areas to which boats must have access require dredging. The natural forces of wind and tide working on the seabed and banks of the water cause filling to occur as a matter of course. However, areas around the outlets of drains, rivers, and streams

---

4. Following the trial of this action, the Court, with the consent and in the presence of counsel, made an inspection of the boatyard and surrounding areas.

generally must be dredged more frequently than other areas. He also testified that one would normally expect an area to fill in uniformly; if the fill predominates in certain parts, it is likely attributable to the presence of a drain, river, or stream which introduces an external force acting upon some portions of the area more than others.

Even before the drain was installed in 1954, the area around the Kohlasch boatyard was dredged. Although precise dates were unknown, it was agreed that dredging occurred at least once in this time, and several times between 1947 and 1959. However, after 1959, the area was not dredged again until 1978, a period of almost twenty years. Defendants thus contend that this area, like most, requires periodic dredging. Moreover, they argue that the filling in of the area around the marina was particularly severe because of the loading and unloading of barges carrying sand and gravel at the adjacent dock of the Nelstad Sand and Gravel Co. and also the natural erosion of neighboring banks. There was evidence that the barges caused much spillage of sand while at the dock. Further, although many of the surrounding banks are paved over, some are not, and there is no evidence as to how long those that are paved have been. In addition, there is a sewage treatment plant at the mouth of the main channel with storm drains. Thus defendants urge that the drainage discharge is a minimal cause if at all, of the problems of which plaintiffs complain.

Plaintiffs' engineering expert, John Connors, testified at length both on general principles governing filling of shore areas and also on his own study of the Kohlasch area. Connors took depth soundings throughout the channel in front of the Kohlasch boatyard in 1977 and, from the readings (and with the help of data from an independent survey done in 1969) was able to compute the amount of fill in the basin around the marina and also to plot and graph the current depths along the centerline of the channel as well as the change of depths between 1969 and 1977.

From his calculations, he concluded that, since the installation of the drain in 1964, an average of 115 cubic yards of fill was introduced into the basin each year. He further found that, between 1969 and 1977, an average of seven feet of material filled in the area around the marina with the result that about half of the marina was dry at low tide. Based upon his various calculations, he concluded that factors other than the discharge from the drain played a very small part in the shoaling of the marina basin.

Connors testified that shoaling due to natural forces should be uniform over the entire area. Thus, materials carried in and out of Long Island Sound as part of the regular tidal exchange would be deposited uniformly throughout the basin; in any event, the effect of these particles, Connors stated, would be minimal because the Sound is relatively clean and the water would not have enough force to carry much material so far into the channel. Similarly, Connors discounted the effect of the sand and gravel spillage from the adjacent dock; he opined that that material would spill into the main channel just beyond the Kohlasch marina area and, because that area is wide and that material heavy, the water would not have enough force to carry the material far. Thus the expert concluded that the effluent from the drain flowing from the Sentinel property and then onto the Kohlasch property was the principal cause of the shoaling.

In 1978, Kohlasch engaged Sound Towing and Dredging Corp. to dredge the area around the basin of the marina. Four scow loads of fill, amounting to 1545 cubic yards, were towed to approved dumping grounds in New Haven. The dredging was to a depth of four feet at mean low water and, as noted above, this has since filled in almost two feet. Plaintiffs assert that the cost and burden of this dredging should properly fall on defendants.

As before noted, only plaintiffs' admiralty claims are before the Court. Thus, the Court is concerned only with allegations of interference with navigational rights. At the outset, the Court finds that with respect to this claim there is no basis for

imposing liability upon the City. The proof establishes that the Authority maintained and controlled the drain and connected the drain to a small part of the already existing City system and was in complete control of the drainage system that eventually led to the Sentinel property over which it had acquired an easement for that purpose. The City did not seek or construct the Authority drain, which was connected to the City's drains only out of physical necessity and which drains effluent from less than one percent of the City's streets. Thus the Court considers only the claim by Kohlasch against the Authority.

Like the public at large, Kohlasch has the right to use navigable waters and as a riparian owner has the right to free access to such waters. In a nutshell, then, Kohlasch's complaint before the Court is that effluent from the drain causes shoaling, which in turn hinders access to the boatyard from the channel. The defendants, as noted, attribute the shoaling to other causes.

However, in addition to this issue, the defendants focused much of their efforts at trial on attempting to demonstrate that Kohlasch does not have title to the property he claims which is beyond the mean high water. Although Kohlasch claims title by virtue of his deed, the defendants contend that, because under New York law land beyond the mean high water mark is owned by the state in the absence of a formal grant by patent, that land was not the City's to convey.[5] The Court need not, and hence does not, reach that issue,

however, for it is clear that, to assert the admiralty claim before the Court, Kohlasch need not own the land under the channel which has allegedly become shoal. To prevail, it is enough that he alleged and can establish his navigational rights have been injured.[6] Although navigational rights are for the public in general, and so in a sense the nuisance here alleged is a public nuisance, Kohlasch still may assert this claim because, as operator of a boatyard along the affected water, he is affected in a special and unique way.[7]

Not all impediments to navigation, however, violate navigational rights. Those done under some claim of right or lawful authority are not actionable.[8] For example, where the Army Corps of Engineers had issued permits allowing dredging in navigable waters, a complaint that that dredging interfered with navigational rights could not stand because of the legal authorization; just as zoning may curtail certain property rights, in this instance where use of common property is authorized, there cannot be a nuisance.[9] And as the Second Circuit has noted, "A pipe line laid in accordance with proper public authority so far as it impeded further navigation would not be actionable any more than the lawful construction of a bridge across a navigable stream would be. The riparian owner could not maintain a libel under such circumstances."[10]

The inquiry then turns to whether the Authority has the right to permit the effluent from the drain to flow across the

---

**5.** *People v. Steeplechase Park Co.*, 218 N.Y. 459, 113 N.E. 521 (1916); *In re City of New York (Amer. Pres. Lines, Ltd.)*, 281 App.Div. 315, 119 N.Y.S.2d 391 (1st Dep't 1953), *aff'd*, 3 N.Y.2d 775 (1957).

**6.** See *Sound Marine & Machine Corp. v. Westchester County*, 100 F.2d 360 (2d Cir. 1938), *cert. denied*, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939).

**7.** See *Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 722, 18 L.Ed. 96 (1865); *Sound Marine & Machine Corp. v. Westchester County*, 100 F.2d 360 (2d Cir. 1938), *cert. denied*, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939).

**8.** *Gilman v. Philadelphia*, 70 U.S. (3 Wall.) 713, 729, 18 L.Ed. 96 (1865); *State of Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 432, 15 L.Ed. 435 (1855); *Sound Marine & Machine Corp. v. Westchester County*, 100 F.2d 360, 363 (2d Cir. 1938), *cert. denied*, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939); *Potomac River Ass'n v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344, 359 (D.Md.1975).

**9.** *Potomac River Ass'n v. Lundeberg Maryland Seamanship School, Inc.*, 402 F.Supp. 344, 359 (D.Md.1975).

**10.** *Sound Marine & Machine Corp. v. Westchester County*, 100 F.2d 360, 363 (2d Cir. 1938), *cert. denied*, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042 (1939).

navigable waters in front of the Kohlasch property. The Authority asserts such a right by prescription. Thus, even if it were to be found that the erosion and shoaling of plaintiffs' property were due to the spillage from the thruway drainage and not to natural causes as defendants contend, plaintiffs cannot prevail if the defendants acquired such a right.[11]

It is axiomatic that, to obtain a prescriptive right, a party must show possession or use that is hostile and under claim of right, actual, notorious, exclusive, and continuous.[12] Once it is established that use is actual, notorious, exclusive, and continuous, a presumption is established that the use was also hostile and under claim of right, and it is the burden of the party opposing the prescriptive right to show that the use was by permission.[13] The right gained can be no greater than that actually used throughout the statutory period, and an expansion of use during the period may defeat the claim of prescriptive right; this is so because a prescriptive right is presumed to have started with a grant, but the actual use is the only remaining evidence of that grant, and so the right can exist only as to what has been used continuously.[14] Further, the kind of use involved in this action—drainage of effluent matter on to property with consequent shoaling—may be obtained by prescription.[15] In this case, the period of limitation to claim a prescriptive right is fifteen years.[16]

The drain was constructed in 1954, and effluent originating on the New Roc-

helle portion of the thruway and the streets of the City spilled from the drain and into the channel in front of Kohlasch's property from that date. Plaintiffs' expert testified that most of the erosion caused by the outflow occurred in a short period of time thereafter, and that the amount of fill deposited in the basin of the marina since 1954 was about 115 cubic yards per year, spread out fairly evenly over the entire period. Further, plaintiffs were aware of the construction of the drain in 1954; indeed, Robert Kohlasch testified that soon after the installation of the drain, mud began to build up around the marine railway, and this had to be scooped out.

There is thus no question that defendants' drainage has flowed on this course continuously since 1954 and with the knowledge of plaintiffs. Thus, defendants' use was open, notorious, continuous, and exclusive. Having demonstrated this, defendants did not have the burden of proving the use was also hostile;[17] however, there is ample evidence as to that element as well. The Thruway did not seek Kohlasch's permission to use the property for the effluent because it believed, as it still maintains, that the land over which the effluent flowed is state-owned and hence it was unnecessary to obtain Kohlasch's permission. Further, it is obvious that Kohlasch never has given such permission nor was it requested.

Kohlasch's contention that there can be no prescriptive rights gained (and, corre-

---

11. Although the Court does not rule on the issue of title to the land under the water, it notes that, even if it did and found that Kohlasch had good title to that land, defendant would be able to assert this defense of prescriptive right.

12. E. g., DiLeo v. Pecksto Holding Corp., 304 N.Y. 505, 512, 109 N.E.2d 600 (1952); Village of Schoharie v. Coons, 34 A.D.2d 701–702, 309 N.Y.S.2d 545 (3d Dep't 1970), aff'd, 28 N.Y.2d 568, 319 N.Y.S.2d 612 (1971).

13. DiLeo v. Pecksto Holding Corp., 304 N.Y. 505, 512, 109 N.E.2d 600 (1952).

14. Prentice v. Geiger, 74 N.Y. 341, 346–47 (1878).

15. See id.; Taylor v. State of New York, 302 N.Y. 177, 187, 96 N.E.2d 765 (1951).

16. Where the statute begins to run before September 1, 1963, as here, the 15-year statute of § 34 of the old Civil Practice Act applies. Fordham Operating Corp. v. County of Westchester, 82 Misc.2d 566, 370 N.Y.S.2d 977, 984 (Sup.Ct. Westch. Co. 1975), aff'd, 382 N.Y.S.2d 292 (2d Dep't 1976). The current period of limitations is 10 years. CPLR § 212(a).

17. DiLeo v. Pecksto Holding Corp., 304 N.Y. 505, 512, 109 N.E.2d 600 (1952).

spondingly, that the period of the statute of limitations could not commence) when use was concealed and the identity of the wrongdoer unknown, is without merit. It is elementary that, absent a showing of fraudulent concealment of the cause of action, a plaintiff's lack of knowledge of the cause of action or of all the facts does not toll the statute of limitations.[18]

Here, plaintiffs knew of the drain and from the beginning associated their problems with it. They now claim only that they did not know whose drain it was. There is no evidence, however, that they made any attempt to determine whose drain it was, and in any event they did not make their first formal complaint to the Authority until 1975, more than twenty years after the installation of the drain. In the light of the trial evidence, it taxes credulity beyond belief to accept plaintiffs' contention that they did not and could not know who operated or was responsible for the operation of the drain. Thus, Robert Kohlasch testified:

Q [By Mr. Reilly, counsel for the Authority]: Did you complain in 1955 to the New York State Thruway about the drain?

A: I had no idea whose drain this was. I knew there was a drain there but I never—to tell you the truth, I didn't give two hoots. Could have been the City of New Rochelle's drain. I wasn't preoccupied or thought whose drain this is. Because at this time my father was very active up until four or five years ago. To me there was a drain there. I could care less whose it was and at the time, good luck with the drain.

Q: Did you complain to the City of New Rochelle in 1955 about the drain?

A: No, sir. I didn't complain to anybody for a number of years. I had no reason to complain.

Q: Isn't it a fact, sir, that the first time you raised your head to the Thru-way and said that this drain was hurting you was in 1975?

A: Very possible. Very possible. When that drain was originally installed, the operation—there was nothing to complain about. Over the years with the lack of maintenance and stuff, it caused problems. We didn't complain—as far as complaints go, I think you might be right, counsel. It was up in those years.

THE COURT: Up in which years, 1975?

THE WITNESS: Right, right.

THE COURT: I am just asking these questions for the purpose of clarification to make sure that I do recall some of the testimony.

I understood you to say yesterday that shortly after the drain was installed that the situation became such there was muck coming out, the foreign material, that your own employees would not go down to scoop out the drainage material but you and your brother went down and my recollection is that you said that this took place soon after the drain was put into operation, which was 1954.

Am I mistaken about that?

THE WITNESS: You are 100% right, your Honor, but we did not make a formal complaint to anybody about it. We bitched about it to ourselves but I did not make any formal complaint to any agency at that time.

THE COURT: If I understand your answer to counsel just a few moments ago, the first time you made a formal complaint you fix about 1975.

THE WITNESS: That is 100% right, your Honor.[19]

The fact that plaintiffs knew of and observed the condition of which they now complain over a period of twenty years, and made no attempt to ascertain who was responsible, does not diminish the right of prescription.

18. *Kern v. Hettinger*, 303 F.2d 333, 338 (2d Cir. 1962); *Eazor Express, Inc. v. United States*, 483 F.Supp. 138, 140 (E.D.N.Y.1980); *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 127, 272 N.Y.S.2d 337, 339, 219 N.E.2d 169 (1966); *Doyle v. 800 Inc.*, 72 A.D.2d 761, 421 N.Y.S.2d 379 (2d Dep't 1979); *Medina Medical Bldg. v. Erie Co. Sheriff's Dep't*, 55 A.D.2d 1026, 391 N.Y.S.2d 257 (4th Dep't 1977).

19. Trial Record at 291–93.

Because the Authority acquired a prescriptive right to discharge the effluent and has continuously done so with the constant effect of putting deposits in the basin, plaintiffs cannot succeed in their admiralty claims.[20] This is not to say, and the Court expressly does not consider or hold, that this prescriptive right is a complete or partial bar to any of plaintiffs' claims previously dismissed from this action and pending in other courts. However, having slept on their rights for a period of time far in excess of the limit allowed by law,[21] plaintiffs cannot sustain their admiralty claims in the face of defendants' prescriptive rights.

Accordingly, the complaint is dismissed.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**20.** *See* cases cited in note 8 *supra*.

**21.** Although unnecessary in light of the disposition of this case, the Court notes that plaintiffs in any event were guilty of laches. Although there is no fixed statute of limitations in admiralty actions, the equitable doctrine of laches applies. Thus, if the period of the most analogous statute of limitations has expired, the burden shifts to plaintiffs to show a satisfactory excuse for the delay and lack of prejudice to defendants. *Public Administrator of County of New York v. Angela Compania Naviera, S. A.,* 592 F.2d 58, 63–64 (2d Cir.), *cert. dismissed,* 443 U.S. 982, 100 S.Ct. 15, 61 L.Ed.2d 897 (1979); *Hill v. W. Bruns & Co.,* 498 F.2d 565 (2d Cir. 1974); *Eazor Express, Inc. v. United States,* 483 F.Supp. 138, 140–42 (E.D.N.Y. 1980); *A. Bottacchi S. A. v. Philipp Brothers Latin America Corp.,* 410 F.Supp. 375, 378 (S.D.N.Y.1976). For the reasons discussed in the text of the opinion, plaintiffs here have not shown a satisfactory excuse for delay. Although the Court need not choose among the possible analogous statutes of limitations which could be applied, it notes that, even if the prescriptive rights of defendants did not provide an absolute bar against the admiralty claims, and if the Court further found defendants liable, the overall monetary recovery would be limited to the limitations period.